**In re BLOOMINGDALE PARTNERS, an Illinois limited partnership, Debtor.**

**Bankruptcy No. 91 B 11678.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

June 7, 1993.

Gregory G. Wrobel, Mitchell G. Jones, John D. Malarkey, Michael L. Kayman, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for debtor.

Philip V. Martino, Rudnick & Wolfe, Chicago, IL, debtor's General Partners.

Peter A. Sarasek, Leonard S. Shifflett, Thomas J. Magill, Todd A. Rowden, Wilson & McIlvaine, Chicago, IL, for John Hancock Insur.

David J. Fischer, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Fleet Nat. Bank.

Katy Gleason, Dept. of Justice, United States Trustee's Office, Chicago, IL, for U.S. Trustee.

### *MEMORANDUM OPINION*

RONALD BARLIANT, Bankruptcy Judge.

The Debtor, a limited partnership, owns a single asset: an apartment building valued at $10,000,000. The building is subject to a first mortgage debt in excess of $11,100,000; the lender elected to treat its entire claim as secured, but now seeks to withdraw that election. The Debtor has proposed a Chapter 11 plan that seeks to "cram-down" the lender's claim, despite the lender's objections. The principal issues are whether the debtor's general partners' negotiation and purchase of certain unsecured claims entitle the lender to withdraw

its § 1111(b) election and, if not, whether the debtor's plan is confirmable under § 1129.[1] For the reasons discussed below, this Court will deny the lender's motion to withdraw its § 1111(b) election, but also will deny confirmation of the pending plan. Finally, this Court will continue the lender's motion for relief from the automatic stay for final hearing within the next three weeks.

## I. THE FACTS

### A. *The Property and the Parties*

The Debtor is an Illinois limited partnership with 65 limited partners and 3 general partners. In 1988, the Debtor completed construction and began the rental and operation of One Bloomingdale Place, an apartment building located in the Village of Bloomingdale, DuPage County, Illinois (the "Property"). The Property is an 8–story, mid-rise, elevator building, containing 168 rental units and 155,683 rentable square feet. The Property has substantial interior amenities and recreational facilities, together with indoor and outdoor parking. Partnership Concepts Realty Management, Inc., ("PCRM"), an established apartment building management firm, manages the Property. PCRM is owned and controlled by the Debtor's general partners and receives a management fee of 5% of the Property's monthly gross income.

Fleet National Bank ("Fleet") provided the original construction financing for the Property, lending $10,750,000 to the Debtor and later an additional $1,000,000. After construction of the Property, the Debtor borrowed $10,400,000 from John Hancock Mutual Life Insurance Company ("Hancock"). The Debtor used the proceeds of the Hancock loan to pay all but $2,100,000 of the Fleet loan. The balance of the Fleet loan was the subject of a subordination agreement between Fleet and Hancock. The Debtor defaulted on the Hancock loan in December, 1990, at which time Hancock accelerated the maturity date. On March 26, 1991, Hancock commenced foreclosure proceedings and scheduled a motion for

appointment of a receiver to be heard on May 31, 1991.

On May 30, 1991, the Debtor filed a voluntary Chapter 11 petition. Within a week, Hancock filed a motion seeking control of the Debtor's cash flows. The Debtor and Hancock then entered into an agreed order stipulating to the use of rents for the payment of ordinary and necessary expenses of operation of the Property, with the balance of the rents paid to Hancock. As of the petition date, the Debtor owed $2,261,343.82 to Fleet and $11,160,387.38 to Hancock. PCRM holds a claim for prepetition management fees in excess of $540,-000. The Debtor owes an additional $700,-000 to Donald Morris ("Morris") for the unpaid balance of the purchase price for the land underlying the Property. Also, the Debtor owes two Chicago law firms a total of approximately $15,000. All claimholders have recourse against the Debtor and its general partners, except Hancock, whose recourse is limited to its collateral.

### B. *Negotiations with Fleet and Morris*

As early as May 17, 1991, two weeks prior to the commencement of the case, the Debtor informed Hancock that it was "continuing negotiations with Fleet National Bank to remove its mortgage as a factor in this matter" and that it expected "to be able to remove [Fleet's mortgage] as a second lien." (Transcript from confirmation hearings at 1662, hereinafter "Tr. ——"). By October, 1991, the general partners believed they had an agreement with Fleet for the purchase of Fleet's claim for $1,550,000, payable in installments. This agreement was contingent upon confirmation of the Debtor's plan of reorganization. In the words of the Debtor's general partner, "Fleet's approval [of the plan] will undoubtedly be necessary for [plan] approval." (Tr. 176). No agreement in fact had been reached in October, 1991.

At that time, the Court held four days of valuation hearings in response to the Debtor's request to value Hancock's collateral. This Court determined the value of Hancock's secured interest in the Property to

---

**1.** Statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

be $10,000,000 for purposes of confirmation. This left Hancock with a claim that exceeded the value of its collateral by approximately $1,100,000, an amount, as discussed below, that might have been asserted by Hancock as an unsecured claim. In February, 1992, not having reached an agreement with the general partners and knowing that by virtue of the size of its unsecured claim its vote could control the vote of the unsecured class, Fleet offered to sell its claim to Hancock for $1,000,000 cash.[2] Hancock declined, believing $1,000,000 to be too much to pay for "a position that had no equity." (Tr. 1641).

In early March, 1992, instead of purchasing Fleet's claim, Hancock reaffirmed with the Debtor that the Fleet mortgage "had to be paid off or removed as a lien" (Tr. 503) as a condition to a consensual workout. The Debtor's general partners told Hancock that they could abide by that requirement (Tr. 504). The general partners then continued to pursue the purchase of Fleet's claim. At the same time, the Debtor filed its third (styled "second amended") disclosure statement and plan of reorganization. The disclosure statement was silent as to any negotiations among the general partners, Fleet, and Morris (who also held a significant unsecured, recourse claim).

Given the $10,000,000 valuation, under § 506(a) and § 1111(b)(1)[3], Hancock's claim would have been divided into a $10,000,000 secured claim (equal to the value of the Property) and a $1,160,387 unsecured claim (the deficiency). Hancock, however, elected, under § 1111(b)(2), to have its $11,160,387 claim treated as fully secured, rather than have its deficiency claim classified as an unsecured claim. One effect of this election was that Hancock lost the right to vote on the plan as an unsecured creditor.

On March 11, 1992, the Debtor filed its "modified" second amended disclosure statement and the pending plan of reorganization reflecting Hancock's § 1111(b) election. The next day, this Court approved the Debtor's disclosure statement.

The general partners continued to pursue settlements with Fleet and Morris. On April 30, 1992, one day before the last date for creditors to accept or oppose the plan, Fleet and the Debtor's general partners signed agreements, whereby the general partners purchased a 99% participating interest in Fleet's claim for $1,550,000 (payable over time) and Fleet agreed to vote its claim in favor of the Debtor's plan. (Subsequent to plan voting, the partners acquired the last 1% of Fleet's claim, converting the total purchase price to $1,050,000 cash.) Similarly, on April 30, 1992, the general partners reached an agreement with Morris, whereby Morris settled his claim for $100,000 cash, plus a promissory note from the partners for $300,000. Upon receiving $100,000 cash, Morris tendered a ballot in favor of the Debtor's plan. The other, non-insider unsecured claimants also voted in favor of the plan. Hancock was the only creditor that rejected the plan.

The confirmation hearings began in July and August, when this Court resolved some of Hancock's objections as matters of law, some of which are more fully discussed below. Several months of discovery disputes then ensued, at which time Hancock became more fully aware of the scope of the transactions among the general partners, Fleet and Morris. Just before the hearings resumed, Hancock filed a motion to withdraw its § 1111(b) election.[4] This motion, together with Hancock's pending motion to lift the automatic stay, was con-

---

2. See Part III (B) below. Fleet's attorney believed Fleet's claim to be valuable to the confirmation process and was selling it to the highest bidder.

3. The operation of these sections of the Code is explained below. See Part III(A).

4. Hancock's withdrawal motion is entitled Motion to Designate and Strike All Votes For Acceptance of Modified Second Amended Plan of Reorganization. Before a withdrawal would

serve Hancock's purposes, this Court would have to designate and strike the Fleet and Morris votes, which otherwise control the unsecured class—hence, the title. However, this Court need not decide whether these creditors should be designated and their votes stricken since Hancock will not be permitted to withdraw its election for the reasons discussed below. Even if the Fleet and Morris votes were stricken, without Hancock, the votes of the remaining small creditors carry the day for the Debtor.

solidated with the balance of the confirmation hearings that this Court heard intermittently from January through March, 1993. The issues presented by Hancock's motions and the confirmation hearings are core. 28 U.S.C. § 157(b)(2)(A), (B), (G), (K) and (L).

## II. MODIFIED SECOND AMENDED PLAN

The Debtor's Modified Second Amended Plan impairs three classes of interest holders and creditors: (1) limited partnership interest holders, (2) unsecured creditors and (3) Hancock. If the Plan is confirmed, the Debtor's partners are required to make an $100,000 aggregate capital contribution. Any partner who fails to make a pro rata share of the required contribution forfeits any interest in the reorganized Debtor. Those who make their required capital contributions retain their interests and are entitled to receive distributions from the cash flow of the Property, but only after payments to the creditors as required by the plan. Unsecured creditors are projected to receive 100% of their allowed claims, payable over time, without interest, from the monthly net cash flows available after payment to Hancock. There is no fixed maturity for the payment of unsecured claims; however, in the event the Debtor converts the Property into condominiums, or sells or otherwise transfers the Property, the unsecured creditors are to be paid the balance of their claims.

The heart of the plan is devoted to the treatment of Hancock's claim. At the confirmation hearing, there was some confusion about what the Debtor is proposing. But the plan itself is clear. Because Hancock elected fully-secured treatment under § 1111(b), Hancock is to retain its lien in the collateral securing the payment of its allowed claim, which as of the filing date was $11,160,387. The Debtor proposes to make payments to Hancock having a present value, as of the confirmation date, equal to the value to the value of Hancock's interest in the Property ($10,000,000); however, the plan further provides that this amount is to be adjusted to reflect the payment of net rents to Hancock during the case pursuant to the agreed cash collateral order.

The plan calls for an amendment and modification of the existing Hancock note, attached as an exhibit to the plan. The note, as amended, provides for the payment of a "Principal Sum" (defined in the plan as the amount of Hancock's allowed claim) and what the Debtor characterizes as the "Secured Portion" of the Principal Sum. The Secured Portion is stated as $10,000,000. Interest accrues only on the Secured Portion at the rate of 8% per annum. Only interest is payable in the first two years of the plan, with the Secured Portion thereafter fully amortized over a period of thirty (30) years. The note matures twelve (12) years [5] after the entry of a final confirmation order when the Principal Sum (not only the Secured Portion) is due and payable, together with all unpaid interest that accrued on the Secured Portion.

Notwithstanding this explicit language in the plans filed before and after Hancock's § 1111(b) election, one of the Debtor's general partners testified that he understood the following to be Hancock's entitlement under the cram-down note: "the payments made periodically during the plan operate as a credit to the obligation of the undersecured portion and that once payments equal to the undersecured portion were made that the debtor's obligation on that amount would be fulfilled." (Tr. 720). While this is a fair summary of one of the cram-down requirements contained in § 1129(b), it is not what the plan says. The plan says payment of the balance of the allowed claim at maturity. Any enlightenment now enjoyed by the Debtor's general

---

**5.** The Debtor's second amended disclosure statement provided that if Hancock were not to elect, Hancock would receive final payment of the principal amount of its secured claim in ten (10) years. Apparently, in the event of Hancock's election, the Debtor felt it necessary to extend the term of the cram-down note from ten to twelve years to make the final payment on Hancock's total allowed claim feasible. *See* Appendix "A" for Debtor's 12–year plan projections.

partners as to the literal requirements of § 1129(b) is irrelevant.

In addition, the plan would obligate the Debtor to make good faith efforts to refinance the outstanding principal balance of Hancock's note every two years. If the Debtor is unable to refinance Hancock's note by year twelve, it must sell the Property for at least the amount of the outstanding balance of Hancock's note. The partners reserved for themselves a right of first refusal in the event of such sale. Should the Debtor's fortunes change, the plan also permits the Debtor to prepay, without penalty, any portion of the Hancock note prior to maturity (although prepayment of the portion of the Principal Sum that does not accrue interest is unlikely). Further, notwithstanding contrary restrictions in Hancock's mortgage, the Debtor has the right to convert the Property to condominiums; provided, however, that no conversion may take place unless the closing proceeds are sufficient to pay the Hancock note in full. Finally, as if to assuage Hancock's fear of non-payment, Article IV (1.9) of the plan requires the partners to make capital contributions to pay the Hancock note if the cash flows from the Property are inadequate. But whatever solace this protection would have afforded Hancock, the same paragraph provides that this obligation "shall be without recourse to any ... general or limited partner of Bloomingdale."

## III. CLASSIFICATION OF HANCOCK'S CLAIM—THE § 1111(B) ELECTION

### A. *The Operation of Sections 502(b)(1), 506(a) and 1111(b)*

■ Hancock's claim is nonrecourse. Under state law, Hancock only may look to its collateral for satisfaction of its claim; it may not otherwise assert a claim against the Debtor and property of the Debtor. Section 502(b)(1) disallows a claim against the Debtor to the extent that "such claim is unenforceable against the debtor and property of the debtor." Barring allowance by some other provision of the Code, § 502(b)(1), therefore, prohibits a creditor

holding nonrecourse claims from asserting claims against the estate beyond the value of its collateral. *See In re PCH Associates*, 949 F.2d 585, 604 (2nd Cir.1991) (§ 502(b)(1) disallows deficiency claim of nonrecourse creditor); Klee, *All You Ever Wanted To Know About Cram–Down Under the New Bankruptcy Code*, 53 Am. Bankr.L.J. 133, 160 (1979) (nonrecourse creditor has no claim for deficiency in Chapter 7).

■ Section 1111(b)(1)(A), however, grants (with certain exceptions not applicable here) a nonrecourse creditor an entitlement unavailable under applicable non-bankruptcy law: "[a] claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same *as if the holder of such claim had recourse* against the debtor on account of such claim, whether or not such holder has such recourse" (emphasis added). By reason of this section, a creditor with a nonrecourse claim against a partnership debtor nevertheless may assert a claim against partnership property in addition to its collateral. *See e.g., PCH Assoc.*, 949 F.2d at 604.

■ Having converted a nonrecourse claim to a recourse claim, the Bankruptcy Code then further classifies such claims in § 506(a). That section provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim." This means that an undersecured creditor is entitled to an additional unsecured claim for its "deficiency", the extent to which its allowed claim exceeds the value of its collateral. *See* § 506(a) and § 1111(b)(1)(A). This is the treatment afforded nonrecourse secured creditors, *unless* they make their "§ 1111(b) election".

■ The "election" is the waiver by the affected class (or, as in this case, the single creditor in its own class) of its § 506(a)

unsecured claim. Section 1111(b)(2) states that "[i]f such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed." This election restores the creditor to nonrecourse status, subject to the Debtor's "cram-down" ability under § 1129(b) as discussed below. Having made this § 1111(b) election, Hancock has an $11,160,387 claim secured by the Property (worth only $10,000,000), with no right to assert an unsecured deficiency claim under § 506(a).

### B. *The Operation of Sections 1126(c) and 1129(a)(10)*

A nonrecourse creditor's right to assert an unsecured claim has ramifications beyond the financial treatment afforded holders of unsecured claims by the plan. Holders of claims that are impaired under the plan are entitled to vote for or against the plan. (Creditors whose rights are not adversely affected by the plan or who will be paid in cash at confirmation are not impaired and are deemed to accept the plan without being able to vote. *See* § 1124 (defining "impaired" claims) *and* § 1126(f) (unimpaired claimants deemed to have accepted plan)). If an impaired creditor's unsecured claim were large enough, it could control the vote of the unsecured class. An impaired class accepts the plan only if at least two-thirds in amount and more than one-half in number of the voted claims favor the plan. *See* § 1126(c). Therefore, the "two-thirds in amount" test cannot be satisfied without the § 1111(b) *non-electing* creditor's assenting vote, if the deficiency claim of that creditor is part of that class and if it is large enough to block acceptance by that class. This power to block acceptance is particularly meaningful when, as in this case, the debtor needs the assenting vote of the unsecured class to confirm a plan. *See* § 1129(a)(10) (at least one impaired class must accept the plan, without considering assenting votes cast by insiders).

This case involves essentially two types of impaired claims: Hancock's claim secured by a lien on the Property and unsecured claims. The Debtor's management company, PCRM, holds a large unsecured claim; however, PCRM is an insider and its assenting vote cannot count. *See* § 1129(a)(10). Had Hancock not made the § 1111(b) election, the unsecured creditors capable of voting (Hancock, Fleet, Morris and the two law firms) would have held claims in excess of $4,000,000. Hancock's unsecured claim as of the date of filing ($1,160,387), however, would not have been large enough to block acceptance by the class of unsecured creditors if the Fleet and Morris ballots were cast in favor of the plan. Therefore, an important reason for *not* making the § 1111(b) election—the power to control the vote—did not exist for Hancock so long as the Fleet and Morris claims could be voted in favor of the plan.

Moreover, as Hancock correctly understood the plan, it would be paid the deficiency portion of its claim (that is, the portion in excess of the $10,000,000 value of the Property) whether or not it elected fully secured treatment, which is not always true in a cram-down case. *See* Part V(A) below. In this case, however, unsecured creditors are offered 100% over time, and Hancock, if it does make the election, is offered payment of the deficiency portion by the maturity of the 12–year note. The principal difference, to Hancock, between making or not making the § 1111(b) election is that by making the election its deficiency claim is secured by the Property, which may appreciate in value. Given the choice, and believing it could not cast a blocking vote as part of the unsecured class, Hancock elected fully secured treatment.

## IV. HANCOCK'S MOTION TO WITHDRAW § 1111(B) ELECTION

The foregoing perhaps explains Hancock's rationale for making its § 1111(b) election. But now Hancock wants to rescind its election. Remember that one of the reasons for *not* making the election is to control the vote of the unsecured creditor class; however, Hancock, unable to block assent, chose what it felt was the more secure stream of payments. If Hancock thought it could have controlled the

vote, it may have chosen to keep its unsecured claim in order to block confirmation of the plan. As it turns out, the Debtor's general partners purchased the claims of Fleet and Morris contemporaneously with the casting of assenting votes by those non-insiders. Hancock claims that the partners bought these claims in a secretive fashion in order to "lock-up" the vote of the unsecured class. *See* footnote 6, below. If the Fleet vote is stricken for being controlled by an insider, Hancock's deficiency claim could block acceptance by the unsecured class. Therefore, Hancock would like to take back its 'election and block confirmation of the plan. *See* § 1129(a)(10).

■ Federal Rule of Bankruptcy Procedure 3014 states that an § 1111(b) election is binding "with respect to the plan." Courts have interpreted this Rule to permit withdrawal of an election if the plan is materially modified. Such a modification, according to these courts, would be tantamount to a new plan. *See e.g., In re Keller*, 47 B.R. 725, 730 (Bankr.N.D.Ia.1985); *Matter of IPC Atlanta Ltd. Partnership*, 142 B.R. 547, 553–54 (Bankr.N.D.Ga.1992); *see also In re RBS Industries, Inc.*, 115 B.R. 419, 421 n. 2 (Bankr.D.Conn.1990). Although "materiality" is incapable of precise definition, it appears from the facts of these cases that the courts look beyond whether a plan modification is "material" in the general sense. Rather, these courts do not allow a creditor to withdraw its § 1111(b) election unless a proposed modification is objectively and materially adverse to the creditor. *IPC Atlanta*, 142 B.R. at 553–554 (original plan proposed to credit pre-confirmation payments against amount of secured claim but modification proposed credit against future debt service under plan; court deemed modifications not "material"); *Keller*, 47 B.R. at 729–30 (creditor would have controlled vote of unsecured class but for election; court refused to allow creditor to withdraw election to "correct its 'mistake'"). In other words, the § 1111(b) election is binding with respect to the plan, unless a modification is proposed that is prejudicial to the electing class and is of a nature that would lead a hypothetical reasonable investor typical of holders of claims in that class to reconsider its election. *See* FED.R.BANKR.P. 3014; *compare* § 1125(a)(1).

■ The pending "modified" second amended plan, however, is essentially the same plan as the second amended plan on which Hancock based its election, with most of the changes made to reflect Hancock's election. Both plans offered payment of the full claim, secured by the Property, but with interest on only $10,000,000. Therefore, the plan has not been materially modified and Hancock's motion to withdraw its election on that basis is denied. But Hancock has another basis for its motion: Hancock complains that the Debtor's second amended disclosure statement contained inadequate information to enable it to make an informed, rational § 1111(b) election. *Cf. In re Channel Realty Associates*, 142 B.R. 597, 600 (Bankr.D.Mass. 1992) (creditor has exclusive right to make § 1111(b) election "after fully evaluating its options").

■ This objection is substantially similar to the objection § 1111(b) creditors make regarding materially altered plans— in either case, the creditor objects that it should not be bound to an election when it was unable to make a fully informed evaluation of its treatment under the plan (or the plan, as modified). In fact, these objections can be viewed as essentially the same because proponents of plan modifications must comply with disclosure statement requirements with respect to the plan as modified. *See* § 1127(c). After all, it is the disclosure statement that triggers a creditor's election of § 1111(b). A creditor cannot be required to state its election before the end of the hearing on the adequacy of the disclosure statement. *See* FED. R.BANKR.P. 3014, 9006(c)(2). Therefore, it is as appropriate to permit withdrawal of an § 1111(b) election when the disclosure statement is materially inadequate as when the disclosure statement is materially altered to comply with a plan modification. *See In re Applegate Property, Ltd.*, 133 B.R. 827, 832 (Bankr.W.D.Tex.1991).

■ According to Hancock, it is entitled to withdraw its election because the Debtor failed to provide adequate information in the disclosure statement regarding the general partners' efforts and "agreement in principle" to buy and vote unsecured claims. This is so, Hancock maintains, regardless of Hancock's sophistication or independent knowledge of the alleged material omissions from the disclosure statement. This Court rejects Hancock's formulation of the test for adequate information under § 1125. Section 1125(a)(1) defines "adequate information" as information "that would enable a *hypothetical reasonable investor typical of holder of claims or interests of the relevant class* to make an informed judgment about the plan...." (emphasis added). Depending on the level of sophistication among "typical" holders in each "relevant class", the required information for each relevant class may vary. *See*, Note, *Disclosure of Adequate Information in a Chapter 11 Reorganization*, 94 Harv.L.Rev. 1808, 1817 n. 68 (1981); *see also* § 1125(c) (different disclosure statements may be delivered as between classes).

■ Section 1125(a)(2)(C) is more on point regarding the inclusion of information already known to the relevant class. This section further defines "adequate information" by defining the phrase "investor typical of holders of claims or interests of the relevant class" as an investor having the *"ability to obtain such information from sources other than the disclosure* required by this section as holders of claims or interests in such class generally have." The House Report adds that "the hypothetical investor against which the disclosure is measured must not be an insider if other members of the class are not insiders, and so on." HR Rep. No. 595, 95th Cong., 1st Sess. 409 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6365. In other words, if a class of *all* insiders has information from sources other than the disclosure statement, that information would not need to appear in the disclosure statement to constitute "adequate information" *for that class of insiders.* Since Hancock is in a class by itself, "adequate

information" obtained by Hancock from sources other than the disclosure statement need not appear in the disclosure statement for Hancock's informed judgment. *See e.g., In re Northwest Recreational Activities, Inc.*, 8 B.R. 10, 11–12 (Bankr.N.D.Ga. 1980) (Norton, J. Wm.) (modest disclosure statement deemed adequate for class of creditors who possessed substantial information from other sources). Therefore, the relevant inquiries regarding Hancock's motion to withdraw its election are: (1) what did Hancock know; and (2) when did Hancock know it.

■ Hancock knew that the unsecured class included the claims of Fleet and Morris. Other than these claims, and excluding the approximately $540,000 claim of the insider management company, the unsecured class included claims from two non-insider Chicago law firms for a total of approximately $15,000. Therefore, prior to Hancock's § 1111(b) election, the Fleet and Morris claims, if voted identically, would have controlled over two-thirds in amount of the eligible unsecured class. *See* § 1126(c).

The Fleet and Morris claims are significant in another respect—unlike Hancock, Fleet and Morris have recourse against the Debtor, and, by operation of law, the Debtor's general partners. As a result, not only did the general partners have an interest in a confirmed plan as equity holders, they had a real interest in mitigating personal liability on the Fleet and Morris claims. More important, as a condition to negotiation of any out-of-court settlement, Hancock prohibited payments to any junior lien creditor while Hancock's debt service was not being paid in full. This meant Fleet. Despite these incentives for the partners to settle the Fleet and Morris claims and the extensive maneuvering by the general partners behind the scenes, the disclosure statement filed immediately prior to Hancock's § 1111(b) election was silent as to any negotiations among the general partners, Fleet and Morris.

The general partners' conduct is relevant with respect to Hancock's § 1111(b) with-

drawal motion only if Hancock was unaware of that conduct and if knowledge of that conduct would have had a material impact on its § 1111(b) election.[6] Testimony adduced at trial shows that Hancock was aware at the time of its election of the possibility that it could block assent by the unsecured class. (Tr. 1646). Prior to its election, Hancock communicated to the Debtor's general partners that the Fleet mortgage "had to be paid off or removed as a lien" (Tr. 503) as a precondition to a consensual workout. The general partners conveyed to Hancock that they could abide by that requirement. (Tr. 504).

Hancock argues that this knowledge is not the same as knowing that the general partners were negotiating to acquire Fleet's claim *in order to control Fleet's vote*. But whether there is a valid distinction between acquiring Fleet's mortgage and acquiring Fleet's vote is irrelevant for purposes of Hancock's motion—the partners were negotiating to pay the Fleet debt and Hancock knew this. This knowledge alone is sufficient to bind Hancock to its election. If the partners merely were paying off the Fleet debt (and not seeking to vote the claim), Hancock would have had the same voting power in the unsecured class as it would have had if the partners attempted to vote the Fleet claim. In the former case, Fleet's claims would not exist; in the latter case, Fleet's claim would exist but its vote would not count. Either way, Hancock would have been able to block approval by the class of unsecured creditors. Therefore, Hancock possessed knowledge at the time of its § 1111(b) election satisfactory to apprise it of the possibility of controlling the unsecured class.

The reality is that Hancock would like to take advantage of the conduct by the general partners. Hancock made the election not knowing whether the partners would be successful in purchasing the Fleet and Morris claims; but, Hancock knew that the general partners were negotiating to extinguish their personal liability to Fleet and Morris. If the partners were successful, Hancock could have controlled the unsecured class; but, if their efforts were unsuccessful, the unsecured class likely would have accepted the plan over Hancock's objection. Fleet and Morris had nothing to gain from blocking confirmation and allowing Hancock to foreclose on the Property—without the Property, Fleet would lose a portion of its security and Morris would lose the cash flows from the Property as a source of repayment. Hancock chose to accept secured treatment for its entire claim rather than gamble on a chance to block confirmation if the Fleet vote were disqualified. There is no reason to allow Hancock to change its mind.

The Debtor established at the hearing that Fleet had not firmly agreed to sell its claim to the general partners prior to Hancock's § 1111(b) election, even though the Debtor had thought at times that an agree-

6. The general partners' conduct also forms the basis for confirmation objections. Hancock objects that the general partners improperly solicited votes and that certain votes cast must be disallowed as being cast by insiders. It turns out that Fleet negotiated to sell a 99% interest in its claim to the general partners in satisfaction of their personal liability to Fleet. If Hancock had not made its § 1111(b) election, Fleet's assenting vote would have been critical for confirmation. Fleet and the general partners, therefore, believed that this structure would permit Fleet to remain the "holder" of the claim for voting purposes. Hancock claims that negotiating this transaction constitutes "solicitation" of votes in contravention of § 1125(b) and that the general partners' 99% interest constituted sufficient control over the Fleet claim to disqualify the Fleet vote. The 99% participation structure supposedly was Fleet's concept to insure that plan payments went directly to Fleet as additional security for the payment by the general partners for their 99% interest. This may be true; but, it is also true that Fleet could have sold 100% of its claim to the partners and taken back an assignment of the plan payments. A 100% sale, however, would not be as valuable to the general partners for voting purposes. This is not to say the 99% participation structure would have achieved the partners' and Fleet's goals. Indeed, if acceptance by the unsecured class turned on Fleet's vote, the Debtor would have significant problems. *See e.g., In re Wiston XXIV Ltd. Partnership,* 153 B.R. 322, 323–326 (Bankr.D.Kan.1993) (court disallowed vote of creditor who entered into agreement to receive $105,000 conditioned on its rejection of plan). However, the unsecured class included the assenting votes of two non-insider Chicago law firms. Therefore, regardless of the validity of the Fleet vote, the unsecured class accepted the plan.

ment had been reached. Had an agreement been reached prior to the approval of the disclosure statement and Hancock's attendant § 1111(b) election, this would have been material information required to be included in the disclosure statement if not otherwise known to Hancock. But an agreement had not been reached. Hancock's motion to withdraw its § 1111(b) election, therefore, is denied.

## V. TREATMENT OF HANCOCK'S SECURED CLAIM UNDER § 1129(B)

### A. Elements of Cram–Down

■ By making its election, Hancock gave up its unsecured, deficiency claim. Instead, Hancock has the right to have its entire allowed claim treated as a secured claim for purposes of § 1129(b), the cram-down provision of Chapter 11. A plan may be confirmed over the objection of an impaired secured creditor (crammed-down) only if the creditor receives "fair and equitable" treatment. Under § 1129(b)(2)(A)(i)(II), "fair and equitable" treatment must include the receipt of "deferred cash payments totaling at least the allowed amount of such claim." Because of the § 1111(b) election, the "allowed amount" is the full prepetition claim regardless of the value of the collateral. These "deferred cash payments" also must be "of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." See § 1129(b)(2)(A)(i)(II). So, the same payments under the plan

must satisfy two requirements: (1) the simple, arithmetic total of the stream of payments must at least equal the total claim, and (2) those payments must have a present value equal to the value of the collateral.

■ Under these cram-down requirements (ignoring for the moment the different actual terms of the plan in this case), Hancock would receive *no real payment* for the portion of its claim in excess of the $10,000,000 value of its collateral. This occurs because all that § 1129(b)(2)(A)(i)(II) requires is that deferred cash payments total the amount of the allowed claim. If the interest payments are structured so that this face amount test is met, the present value (or real payment in economic terms) may never exceed the value of the creditor's interest in the Property (here, $10,000,000). "[T]he interest payment is doing double duty. First, the interest on the [$10,000,000] is what gives time payment of [$10,000,000] a present value of [$10,000,000]. Second, the interest payments themselves make up the remainder of the 'payments' under the plan so that the 'total payments' will equal [the total allowed claim of $11,160,387]." 3 DAVID G. EPSTEIN, STEVE H. NICKLES AND JAMES J. WHITE, BANKRUPTCY § 10–27, at 52 (1992) (hereinafter "BANKRUPTCY") [7].

■ In this case, the interest payments for the first two years of the plan ($1,600,000) exceed the amount of Hancock's deficiency claim ($1,160,387 as of the filing).

---

7. Section 1111(b) prevents debtors from proposing in the plan to pay the creditor only the appraised value of the collateral immediately after confirmation of the plan. By making the election, the creditor would force the debtor to pay the full claim. But to the extent the plan stretches out the payments over time, the economic benefit of an election diminishes towards the vanishing point. Thus, commentators have argued that § 1129(b)(2)(A)(i)(II), read literally, does not accomplish what they assert was intended for § 1111(b) electing creditors. See Eisenberg, The Undersecured Creditor in Reorganizations and the Nature of Security, 38 Vand. L.Rev. 931 (1985); BANKRUPTCY § 10–27, at 50–54. According to these authors, Congress enacted § 1111(b) to prohibit debtors from "cashing-out" creditors at judicially determined values; however, the literal language still permits a

debtor to "cash-out" a creditor by stretching payments out over a long enough period of time so that no economic value is paid against the deficiency balance. Eisenberg at 971, EPSTEIN, ET AL. at 52–53. Eisenberg suggests an alternative argument for creditors—the lien required by § 1129(b)(2)(A)(i)(I) must remain in place until a note evidencing the creditor's total allowed claim is paid in full. Anything less, he argues, would not be "fair and equitable". Eisenberg at 971. Epstein, drawing from legislative history of § 1129(b), suggests that § 1129(b) may have been intended by Congress to mean "principal face amount" instead of what it says—"deferred cash payments". These are questions that need not be resolved in this case since the Debtor offered Hancock exactly what Eisenberg and Epstein suggest may have been the result intended by Congress.

Without the election, the Debtor would have had to pay Hancock on its unsecured deficiency claim *and* make the same interest payments to pay the present value of $10,000,000. With the election (had the plan not proposed more), the Debtor need only have paid the present value of $10,-000,000 and Hancock would have received no additional benefit. Under the Debtor's plan, however, Hancock is to receive present value payments, plus the balance of its claim at maturity.

Although Hancock is getting more under the plan than the minimum required by the cram-down provision, it still claims that it is not receiving fair and equitable treatment. Principally, Hancock's objection focuses on the requirement that it receive the present value of its collateral. In order to resolve this objection, this Court must resolve three issues of fact: (1) the amount of Hancock's claim that must be paid in terms of present value and the amount that must be paid at maturity, (2) the standard for determining the discount or interest rate necessary to achieve "fair and equitable" present value and (3) applying that standard, whether the 8% interest rate offered by the Debtor is adequate.

### B. *Hancock's Allowed Claim*

The Debtor's plan proposes to pay the present value of Hancock's claim only to the extent of the value of Hancock's collateral, or the "Secured Portion". This amount is shown in the cram-down note as $10,000,000, but the plan proposes to deduct from that amount the sum of cash collateral payments made to Hancock during the case. Allowing Hancock to retain postpetition payments without an offset against the value of Hancock's interest in the Property, the Debtor argues, would be tantamount to paying Hancock post-peti-

tion interest in violation of § 506. *See U.S. Assn. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 372–74, 108 S.Ct. 626, 631–633, 98 L.Ed.2d 740 (1988). The Debtor's argument ignores Hancock's post-petition security interest in net rents.[8] *Compare In re Reddington/Sunarrow Ltd. Partnership*, 119 B.R. 809, 812 (Bankr.D.N.M.1990) (court used date of filing to measure lender's security interests) *with Vermont Inv. Ltd. Partnership*, 142 B.R. at 573 (criticizing *Reddington* for disregarding § 552). If, for purposes of confirmation, additional security accrues post-petition, then post-petition payments merely may be agreed prepayments of a secured claim, not unpermitted payments to an undersecured creditor. The resolution then would depend on whether the value of a secured creditor's interests in property of the estate has *increased* during the pendency of the case. *See In re Flagler–at–First Assoc., Ltd.*, 114 B.R. 297, 304 (Bankr.S.D.Fla.1990); *In re Dacon Bolingbrook Associates L.P.*, 153 B.R. 204, 213–14 (N.D.Ill.1993). This is consistent with the Supreme Court's recent observation that "[a]ny increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain." *Dewsnup v. Timm*, —— U.S. ——, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992).

Moreover, section 552(b) contemplates that a secured creditor may be entitled to an additional interest in estate property that only accrues post-petition—specifically, a perfected security interest in post-petition rents. The Supreme Court observed that perfection of a security interest

---

8. This Court does not have to decide the difficult issues surrounding Hancock's interest in the rents, *see e.g., In re KNM Roswell Ltd. Partnership*, 126 B.R. 548, 552–554 (Bankr.N.D.Ill. 1991), since the agreed cash collateral order provides that June 6, 1991 is "the date John Hancock perfected its Notice Pursuant to Section 546(b) of the Bankruptcy Code." The cash collateral order further provides for Hancock to receive *net* rents, after payment of ordinary and necessary operating expenses. This is akin to giving Hancock a security interest in all the rents and charging § 506(c) expenses against that interest. *See In re Landing Assoc., Ltd.*, 122 B.R. 288, 297 n. 7 (Bankr.W.D.Tex.1990); *In re Vermont Inv. Ltd. Partnership*, 142 B.R. 571, 574 n. 4 (Bankr.D.Dist.Col.1992). Therefore, Hancock has a perfected interest in net rents under § 552.

in rents is "a condition of having them applied to satisfying the claim of a secured creditor ahead of the claims of unsecured creditors." *Timbers*, 484 U.S. at 374, 108 S.Ct. at 632. This entitlement only can have meaning if the determination of the creditor's security interests occurs post-petition. Further, section 506(a) directs that valuations be determined "in light of the purpose of the valuation." The purpose here is confirmation. *See Landing Assoc., Ltd.*, 122 B.R. at 297 (date of confirmation, not date of filing, should be used to determine value of security interests). Taken together, sections 506(a) and 552(b) require that Hancock's post-petition security interest in rents be added to its separate security interest in the Property.[9] Not counting Hancock's security interest in rents would render § 552(b) a "practical nullity and theoretical absurdity." *Timbers*, 484 U.S. at 375, 108 S.Ct. at 632; *accord,* K. Klee, "Timbers, Ahlers and Beyond", *62nd Annual Meeting of the National Conference of Bankruptcy Judges,* October, 1988 at p. 422 (§ 552 rents may increase allowed secured claim), *cited in Flagler,* 114 B.R. at 304.

■■■■■ The Debtor's plan proposes to pay Hancock the present value of $10,000,000 and the balance of its allowed claim at maturity. While the amount of Hancock's "allowed claim" cannot increase during the pendency of the case, its "secured claim" can. Technically, but for the post-petition payments of rents by the Debtor, the value of Hancock's security interests would have been commensurately higher and entitled to present value payments under § 1129(b)(2)(A)(i)(II). The plan would be deficient for not treating the post-petition rents as additional collateral; but, because the Debtor already has paid Hancock several hundred thousand dollars and Hancock has been able to reinvest those sums, the cram-down requirement for that amount has been met—in effect, prepaid. *See In re Oaks Partners, Ltd.,* 135 B.R. 440, 451 (Bankr.N.D.Ga.1991) (secured claim does not increase *if* net rents are paid to lender); *but compare IPC Atlanta Ltd. Partnership,* 142 B.R. at 559 (citing *Oaks Partners* for proposition that secured claim can never grow during the case).

The fact that the parties termed these payments as "adequate protection" of Hancock's interest in the rents is of no consequence. *See Flagler,* 114 B.R. at 300. The agreement was to pay Hancock net rents directly. The agreed cash collateral order is contractual and prepayment of Hancock's secured interest in rents is the price paid for Hancock's forbearance.[10] Therefore, this Court will treat the post-petition payments as prepayments of Hancock's claim, thereby reducing the Principal Sum due at maturity under Hancock's cramdown note.[11]

9. This Court is not persuaded by the Debtor's argument that any recognition of a security interest in "rents" should commensurately reduce the value of Hancock's interest in the Property. As the court in *Landing Assoc., Ltd.,* 122 B.R. at 296, astutely noted "[a] creditor with a deed of trust *and* an assignment of rents can not only foreclose on the real property but can also seize the rents *before* foreclosing on the real property." *See also Dacon Bolingbrook Associates,* 153 B.R. at 210. Section 552 recognizes this entitlement to collect rents while preserving an interest in the underlying property. Moreover, the Debtor's own cash flow projections demonstrate another fallacy in its argument. The Debtor projects that both cash flows and the value of the Property will increase by 4% per year after the first year under the plan. *See* Appendix A.

10. Hancock could have obtained the same result had it successfully argued that the Debtor lacks equity in the net rents and that the net rents are not necessary for an effective reorganization. *See* § 362(d)(2). If this Court then lifted the stay to permit Hancock to exercise its remedies against the net rents, Hancock would apply the rents against the outstanding indebtedness. This approach, too, would have the effect of decreasing the amount of Hancock's allowed claim, not the extent of Hancock's claim secured by the value of the Property.

11. In fact, after the Debtor accounts to Hancock for all security interests, including post-petition net rents in accordance with the cash collateral agreement, it may not be too long (if not already) before Hancock's security exceeds its claim. Of course, in that event, the entire § 1111(b) issue would be moot. Neither party raised this issue and Hancock's motion for an accounting was voluntarily dismissed without prejudice prior to the final confirmation hearings.

## C. Cram-down Interest Rate Standard

■ With post-petition net rents paid to Hancock, the balance of the value of Hancock's interests in estate property (other than personalty, if secured) is $10,000,000, the value of the Property. Regardless of Hancock's § 1111(b) election, it is this $10,000,000 "value" that is the subject of "deferred cash payments totaling at least the allowed amount of such claim, *of a value*, as of the effective date of the plan, of at least the *value* of such holder's interest in the estate's interest in such property." *See* § 1129(b)(2)(A)(i)(II). A plan must propose an interest rate adequate to assure the realization of that value. Most of the evidence at the confirmation hearing had to do with whether the rate proposed by the Debtor is adequate.

■ The language of § 1129(b)(2)(A)(i)(II) does not necessarily contemplate the risk of noncompliance with the plan. *Compare In re Hudock*, 124 B.R. 532, 534 (Bankr.N.D.Ill.1991) (requirement for interest under § 1325(a)(4) does not contemplate risk of non-compliance; prime rate is appropriate discount rate in Chapter 13 cases [12]). The Code does require, however, that the chapter 11 plan be "fair and equitable." So much has been written on the issue of the appropriate standard for determining a "fair and equitable" rate of interest under § 1129(b), *see Oaks Partners*, 135 B.R. at 442–446, that this Court is satisfied that the standard should be an appropriate risk-free rate plus an adjustment that compensates for the inherent risks imposed on the secured creditor by the Debtor's plan. *Id.* at 445; *cf. Matter of James Wilson Assoc.*, 965 F.2d 160, 172 (7th Cir.1992) (§ 1129(b)(2)(A)(iii) "indubitable equivalent" requires that the interest rate compensate the lender for the opportunity cost of its money and the risk of default).

■ This Court announced that standard in August, 1992, and directed the parties to submit an appropriate order. Typical of the inability of the parties to agree, they submitted two proposed orders. The most significant disagreement was whether the adopted interest rate standard includes "profit" to the lender. It does not. One of the reasons for rejecting the "market rate" or "coerced loan" theory is that an inefficient (or more likely, non-existent) cramdown market allows lenders forced to make cram-down loans to charge a premium, a rate of interest in excess of the actual risks of the loan. Earning this premium is commonly called arbitrage, another word for "profit." If the market for troubled loans were well-functioning, theoretically no lender would have the opportunity to charge an interest rate in excess of a risk-adjusted rate of return.[13] An efficient "market" does not exist for loans equalling 100% of the value of collateral. *See In re Computer Optics*, 126 B.R. 664, 672, n. 11 (Bankr.D.N.H.1991); *but cf. In re Ropt Ltd. Partnership*, 152 B.R. 406, 410 (Bankr.D.Mass.1993) ("lenders would be willing to lend [$3,965,000 secured by property worth $4,200,000 and subject to a superior tax lien of $327,605] for five years at nine percent"). If it did, our task would be much simpler. *See* footnote 13, above. As it is, the interest rate standard chosen by this Court is intended to act as a theoretical model for a well-functioning market, a market that by definition excludes "profit" in the sense of an arbitrage return that results solely from the inefficiency of the market. As aptly noted by Judge Bihary, constructing an efficient market is "easier

---

**12.** There are, however, fundamental policy distinctions between chapter 13 and chapter 11, not the least of which is the need in chapter 13 for a rate that is "applicable to a wide variety of situations, easy to determine, and . . . adjust[s] to reflect changing market conditions." *Id.* Moreover, unlike chapter 13, a creditor in chapter 11 has the right to object to the proposed treatment of its claim and insist that the treatment be "fair and equitable."

**13.** Similarly, Hancock's expert witness, Dr. Ibbotson, testified that "economic profit" is often described in utility rate cases as a return over and above the fair return on capital that the utility is otherwise entitled to. Indeed, if the market for purchasing claims functioned perfectly, this Court would have an alternative basis for testing whether the plan is "fair and equitable" for Hancock—if the interest rate proposed were adequate, Hancock would be able to sell its claim for at least $10,000,000.

said than done." *Oaks Partners*, 135 B.R. at 447.

■ The Debtor, however, apparently had something else in mind when pursuing an order from this Court that excluded "profit." Prior to this Court's oral ruling on the appropriate cram-down interest rate standard, the Debtor argued that the proper standard under § 1129(b) is the creditor's "cost of funds." *See e.g., In re Cassell*, 119 B.R. 89, 90 (W.D.Va.1990) (rejecting "cost of funds" approach under § 1325; illogical results when creditor itself is poor credit risk). The creditor's "cost of funds" can be described as the creditor's weighted average cost of borrowing capital, including both the cost of debt and the cost of equity. *Id.* at n. 3. "Profit", in the context of a creditor's "cost of funds," has an entirely different meaning: a rate of return in excess of the cost of funds. *Id.* at 92; *cf. In re Fisher*, 29 B.R. 542, 545 (Bankr.D.Kan.1983) ("a creditor profits from the interest it charges"). For example, an investor who borrows at 8% and invests at 10% "profits" by 2%. Indeed, no rational investor would seek returns that did not exceed its cost of funds. Undeterred by this Court's rejection of the "cost of funds" approach, however, the Debtor continued to argue throughout the confirmation hearings that Hancock's "profit" must be *deducted* from the risk-adjusted interest rate. The Debtor may have been buoyed by this Court's statement that the applicable rate would not *include* "profit" to Hancock. But, not including "profit" in the context of an inefficient market is markedly different than deducting "profit" in the context of one's cost of funds. The latter necessarily results in the very rate rejected by this Court—Hancock's cost of funds.

### D. *Interest Rate Analysis*

The Debtor proposes to pay Hancock 8% on its $10,000,000 claim. The Debtor first chose 8% based on an assessment of Hancock's cost of funds (not an assessment of risk) and, notwithstanding this Court's later ruling on the applicable interest rate standard, stayed with 8% (Tr. 78). Never-

theless, according to the Debtor, 8% meets the standard set by this Court, a risk-adjusted rate of return without an inclusion of profit to Hancock.

■ A two-fold inquiry is required in order to establish the appropriate risk-adjusted rate under § 1129(b)(2)(A)(i)(II). First, the particular risks that the plan imposes on a secured creditor must be identified and quantified. Then, given the quantified risks, both positive and negative, an adjustment must be made to the risk-free rate that compensates the lender commensurately for the level of risk imposed. *Oaks Partners*, 135 B.R. at 446–447.

■ The appropriate treasury bond will be used to establish the risk-free rate. *Id.* at 446. Treasury bond rates already reflect the market's adjustment for the risk of inflation, allowing us to focus on the risks peculiar to this proposed transaction. At the confirmation hearings, evidence of the risk adjustment needed came from six expert witnesses, three for each party.

### 1. *Debtor's Risk Analysis*

The Debtor solicited testimony from Dr. Edwin Mills, Ph.D. in economics, distinguished scholar and professor, and current director of the real estate program and real estate research center at Northwestern University, Kellogg Graduate School of Management, where Mills focuses a portion of his energies analyzing housing trends in the Chicago metropolitan area. Mills identified three main categories of risk: market risk, project risk, and management or ownership risk. According to Mills, "market risk" broadly includes the national economy and real estate generally and more narrowly includes the relevant real estate market for the Property. "Project risk" includes location, physical characteristics and the type of project as it relates to the targeted market. Specifically, the targeted market here, multi-family rental, requires that the project have appealing size, layout, condition and architecture (both of the building and individual apartments). The presence (or absence) of ancillary facilities, such as parking, swimming pools and laundry facilities, also affect project risk.

"Management or ownership risk" refers to the quality of the owners and managers of the project, as reflected by, among other things, the quality of maintenance and by the tenant retention rate.

Quantifying market risk, Mills estimated that housing production fell nearly 50% during a period of real estate recession from 1987 to 1991; but, in 1992, home construction increased by about 25% nationally and in the Chicago area. Demand for housing is increasing, especially where the Property is located, DuPage County. Increased job opportunities in DuPage County have contributed to the increased demand. In 1989, when the Property was constructed, there was considerable excess housing supply. Now, vacancy rates are lower, rental rates are increasing and Mills does not believe that any significant construction of rental developments is planned for the Debtor's market. Therefore, given national economic trends and economic growth in the Debtor's relevant market, Mills concluded that the market risk is lower today than when the Debtor borrowed from Hancock in 1989 at a rate of about 1.4% over the risk-free rate.

As to project risk, Mills observed that the Property appears to be satisfying its target market, with a proven track record of tenant acceptance. Further, based on his knowledge and observations, including a personal visit to the Property, the Property has been carefully and conservatively maintained. Thus, Mills concluded that expenses should be predictable, resulting in less risk than when the Property was originally constructed and had no "track record". This reduced project risk is related to, and in part a result of, management risk. The Debtor, through its related management company, has maintained the Property well and improved the Property. The renewal rate evidences the tenants' satisfaction with management. On cross-examination, however, Mills admitted that the ability of ownership to fund shortfalls also is a relevant risk and he made no assessment of that in this case.

After convincingly identifying and quantifying real estate risks, Mills offered his opinion on the financial risk to Hancock of making a $10,000,000 loan against collateral valued at $10,000,000. Specifically, the Debtor asked Mills to assess the risk associated with refinancing Hancock's principal balance ten years from now. Mills concluded that the Debtor's growth projections, at 3% for the first year and 4% thereafter, are very conservative and, based on his assessment of the real estate risks, refinancing is likely. Mills added, however: "the only risk concerned with this property given the $10 million valuation which the court has made is in the next year or two; that during that period the ratio of revenues to expenses and debt service are rather close, closer than one would normally want for an arm's length commercial loan" (Tr. 268). Unlike the other risks identified by Mills, this is a risk based on the size of the loan. Mills concluded, however, that the cash flow projections during this risky period are "probably quite accurate" (Tr. 272).

On cross-examination, Hancock pressed Mills on the risk of having a loan-to-value ratio of 1:1. Mills rejected the notion of a loan-to-value ratio as an independent risk, characterizing it as a "summary statistic" (Tr. 285). He similarly rejected as an independent risk the debt service coverage ratio—the number of times net operating income in a given year can pay debt service. According to Mills, these ratios incorporate the types of real estate risks that he previously identified and quantified. But again Mills conceded that "any risk associated with this project is near term. The first one, two, three years, that's when the debt-coverage ratio is very low. I think even on very conservative projections, after three or four years my judgment is that this will be a very viable property even on standard arm's length commercial terms, so I don't think that passage of time is going to make this a lot riskier" (Tr. 296). Hancock also established through Mills that a loan that permits prepayment, such as the one proposed in this case, creates additional risk for the lender.

Dr. R. Bruce Ricks also testified for the Debtor. Like Mills, Ricks' background includes significant academic accomplishments. He holds a Ph.D in finance, taught

finance at various prestigious business schools across the country and was chief economist for the Federal Home Loan Bank Board. Ricks no longer holds an academic appointment; instead, he focuses his energies owning and operating real estate and offering his skills as an expert consultant and expert witness. Ricks frequently testifies in bankruptcy cases regarding the feasibility of plans and appropriate mortgage terms. Ricks' testimony was devoted more to assessing an interest rate than identifying risk. To the extent Ricks did comment on particular risks, his views echoed those of Dr. Mills: the Property is well-maintained, virtually fully occupied and well-positioned in the marketplace and the Debtor's projections regarding future cash flows and loan-to-value ratios are conservative. The Debtor's third expert, Richard Harb, an independent property manager, concurred in these judgments.

Ricks elaborated on the "summary statistics" of ratios for debt coverage and loan-to-value. Ricks acknowledged the slim debt service cushions in the early years of the plan, but discounted their significance given his confidence in the Debtor's projections. According to Ricks, the more certain forecasted cash flows, the less need for cushions in the ratios. This, of course, is tautological—if cash flows were 100% certain, debt coverage and collateral values would be irrelevant and the interest rate would equal the risk-free rate.

### 2. Hancock's Risk Analysis

Hancock's primary expert was Dr. Roger Ibbotson, Ph.D. in finance and economics, professor of finance at Yale University and president of Ibbotson Associates, a financial consulting firm. Ibbotson Associates annually publishes the book *Stocks, Bonds, Bills and Inflation Yearbook*, containing data widely used by investors to estimate cost of capital. According to Ibbotson, this data is often used by real estate appraisers to estimate capitalization rates for valuing real estate. Ibbotson's approach to identifying risk differed in material respects from the approach used by the Debtor's experts. Mills and Ricks assessed, in large part, real estate risks and translated those risks into financial risks for Hancock. Finding the Debtor's projections to be rather conservative based on the low risk aspects of the Property, Mills and Ricks determined that the slim debt coverage and loan-to-value ratios did not pose a significant threat to Hancock. Ibbotson, on the other hand, did not examine the assumptions underlying the Debtor's projections; instead, he focused on financial risks inherent in the structure of the transaction.

Ibbotson determined that, given the initial loan-to-value ratio of 1:1 and narrow debt service coverage during the early plan years, the financial risks of Hancock's note under the plan were similar to corporate bonds with a "Ba" rating. According to Ibbotson, bonds with a Ba rating are somewhat speculative and have a "default risk" similar to the risk of default to Hancock under the plan.[14] Ibbotson also identified a second risk to Hancock—prepayment risk. Ibbotson explained that if interest rates fall during the term of Hancock's note, the Debtor would refinance and force Hancock to reinvest at an even lower interest rate for the remainder of the term. This type of risk is usually mitigated in a loan by providing for a prepayment premium. The Debtor's note permits prepayment without charge. Therefore, Ibbotson concluded, Hancock is forced to accept the additional risk of losing its yield.

### 3. Interest Rate Assessment

Mills concluded that, based on conservative projections likely to be realized and using AA corporate bonds as a reference, he would add 140 to 150 basis points (or 1.5%) to the treasury rate. From that rate he deducted 40 to 50 basis points for Hancock's "profit" to arrive at between 8.1 and 8.2%. According to Mills, this "profit" rep-

---

**14.** Ibbotson borrowed from Moody's definition of Ba rated bonds: "Bonds which are rated Ba are judged to have speculative elements. Their future can't be considered well-assured. Often the protection of interest and principal payments may be very moderate and thereby not well-safeguarded during both good and bad times over the future. Uncertainty of position characterizes these bonds in this class." According to Ibbotson, the Hancock loan shares these features—very thin coverage and risky large principal payment deferred twelve years.

resents "the difference between Hancock's typical recent lending rate and their cost of funds" (Tr. 308). Mills admitted that he had no basis for knowing Hancock's cost of funds other than his own deduction after comparing Hancock refinancing rates with market interest rates. This is a recurrent theme in the Debtor's evidence: deducting this type of "profit" theoretically yields a rate equal to Hancock's cost of funds, the very rate rejected by this Court in adopting a risk-adjusted interest rate standard. Therefore, adding this "profit" back to Mills' own assessment of a risk-adjusted rate yields 8.6%. Mills, however, did not suggest an increased interest rate during the first few years of the plan, a period identified by him as riskier than the last eight years of the plan.

Ricks similarly assessed a risk-adjusted rate of 8%. Ricks' calculation is somewhat more complicated than Mills'. To justify the Debtor's 8% plan rate, Ricks first converted that rate to a "bond-equivalent yield". That is, since the plan pays Hancock monthly and bonds pay semi-annually, Hancock gets the benefit of compounded interest. According to Ricks, receiving 8% monthly is equivalent to 8.13% semi-annually, hence a bond-equivalent yield of 8.13%, or a "pre-profit" bond equivalent rate of 8.63%. Next, Ricks compared that rate to the risk-free rate. Because the Hancock note has a 12–year maturity, Ricks identified 7.02% as the risk-free rate, the rate paid on 12–year treasury bonds. Therefore, the plan pays an effective interest rate 111 basis points above the risk-free rate. As a check against his analysis, Ricks attempted to identify "market" rates for apartment building loans with maturi-

ties in excess of 10 years. Ignoring the highest rate he discovered of 9.5%, he then found the average to be between 8.78% and 8.85%, or about 8.8% as of January, 1993. From this rate, like Mills, he deducted 50 basis points for "profit" to conclude that his rate of 8% was within 30 basis points of the market. In other words, if 50 basis points had not been deducted for "profit", the plan rate would have been 8.5%. Ricks believed, however, that Hancock's real profit was likely more than 50 basis points, justifying a result even lower than 8%.

Ibbotson, as discussed above, identified two types of risk: default risk and prepayment risk. He then attempted to assess an interest rate to compensate for these risks. For default risk, after concluding that the Hancock loan shared similar default characteristics with Ba corporate bonds, Ibbotson created a list of yields from over fifty Ba or similarly rated bonds. Ibbotson sought bonds with a "duration" of seven and one-half years.[15] Ibbotson's list ultimately contained bonds with durations ranging from six to nine years, with an average duration of 6.79 years. The average yield was 10.93%. Ibbotson then compared this yield to the risk-free yield on a treasury bond with a seven and one-half year duration. At the time of his analysis, the treasury bond yielded 6.8%, or 4.1% less than the average Ba corporate bond yield. Therefore, Ibbotson concluded that the "default risk" equaled 4.1%, or 410 basis points.

Ibbotson then added an additional 1.3% to compensate Hancock for the Debtor's prepayment ability. To isolate the prepayment premium, Ibbotson compared yields on FNMA ("Fannie Mae") and FHLMC

---

**15.** The concept of "duration" is critical to Ibbotson's analysis. In finance terms, to find the comparable risk-free rate, the "duration" of the payment stream under the plan should roughly match the duration of the selected treasury bond. "Duration" is the average length of time, in terms of present value, that the investor must wait to receive its investment. For example, whenever present value is paid in one lump sum at some future date, the "duration" of that payment is the year it is paid. If, however, an investment yields periodic cash flows, the calculation becomes a weighted average of the timed payments. That is, the present value income

stream for each year is multiplied by that year and then all amounts are totaled and divided by the total present value. Ibbotson's uncontroverted testimony was that the Debtor's plan—paying Hancock interest only for the first two years and then amortizing $10,000,000 of the principal over thirty years, with a balloon payment in the twelfth year—has a "duration" of 7.5 years. Ibbotson then chose 10–year treasury bonds as the applicable risk-free comparable since these bonds also have a duration of 7.5 years. This is to be contrasted with Ricks' use of 12–year treasury bonds.

("Freddie Mac") bonds. These bonds represent interests in groups of residential mortgages. Because the assets (mortgages) underlying the bonds can be prepaid, the bond must offer additional return for investors. Ibbotson viewed these bond yields as not including any default risk, much like treasuries, because the market prices these bonds as though guaranteed by the federal government. Thus, Ibbotson concluded that 1.3%, the difference between these bond yields and treasuries yields, must be for "prepayment risk" and not default risk. Adding 1.3% to his prior rate of 10.93%, Ibbotson concluded that a risk-adjusted rate of return for Hancock would have to be 12.23%.

Hancock's second expert, Seth Palatnik, a C.P.A. and business evaluator, took a different approach in assessing an interest rate. In Palatnik's view, an investment in real estate similar to the Property usually is financed 75% by borrowing and 25% by equity contributions by the owners. Because Hancock would "contribute" 100% under the plan, Palatnik felt that 75% of Hancock's loan should earn a lender's rate of return and the balance of 25% should earn an equity rate of return. For the debt component, Palatnik surveyed eleven financing sources, including nine insurance companies. Based on this survey, Palatnik concluded that the debt component rate should be between 200 and 250 basis points over the applicable treasury rate. Palatnik, like Ricks, used a twelve-year treasury rate, then at 7.1%. Adding an average 225 basis points, Palatnik estimated 9.35% for the debt component. For the equity component, Palatnik testified that he performed a similar "survey" and concluded that equity return rates were between 15 and 20 percent, for an average of 17.5%. It turns out that Palatnik's survey of equity included only two Chicago area sources. Applying the math, 25% of the loan at 17.5% and 75% at 9.35%, yields a weighted

interest rate of 11.39%. Palatnik then attempted to support this number by comparing the return on high-yield corporate bonds, a bench-mark similarly used by Ibbotson. According to Palatnik, comparable bonds yield 11.29%.

Hancock's third expert, John Tung, one of four members of a midwest team authorized to negotiate troubled RTC loans, offered yet another way of calculating the interest rate applicable for Hancock's loan. First, Tung estimated the risk-adjusted rate to be 11.03%. Based on an October, 1992 survey, Mr. Tung found market rates to be between 8.5% and 9% for apartment building loans with ten year terms and standard debt service coverage (1.2—1.25) and loan-to-value percentages (70%—80%). Tung then added 28 basis points to account for the longer term under the plan of twelve years, and between 100 and 300 basis points to account for the thin debt service coverage and high loan-to-value ratio. This yielded risk-adjusted rates between 9.78% and 12.28%, for an average of 11.03%.

Tung then used "certainty equivalents discounting" to verify the accuracy of his rate. This mathematical formula uses a risk-free rate and projected cash flows and solves for risk-adjusted rates of return based on how certain one is of receiving future cash flows. Based on a risk-free rate of 6.88%, Tung demonstrated that in order for 8% to be appropriate, the Debtor's projected future cash flows must all be 99% certain. In comparison, to arrive at a risk-adjusted rate of 11%, the Debtor's projected future cash flows would be between 96% and 97% certain (or 3% to 4% risk of loss). According to Tung, historical losses have been between 2% and 3% on standard mortgage loans. At 2% to 3% probability of loss, the risk-adjusted interest rate on this loan would be between 9.1% and 10.2%.

## SUMMARY OF INTEREST RATE TESTIMONY

| Expert | Risk-free | Default Risk | Other Risk | Yield | Risk Adjustment | Market |
|---|---|---|---|---|---|---|
| Mills | 7.1 | 1.4%—1.5% | (.4—.5) | 8.1—8.2% | 100—110 b.p. | — |
| Ricks | 7.02 | 1.11% | (.5) | 8.0% | 111 b.p. | 176—183 b.p. |
| Ibbotson | 6.8 | 4.13% | 1.3% | 12.23% | 543 b.p. | — |
| Palatnik | 7.1 | 4.28% | — | 11.39% | 429 b.p. | 200—250 b.p. |
| Tung | 6.88 | 3.87% | .28% | 11.03% | 415 b.p. | 162—212 b.p |

## E. Court's Findings

### 1. Burden of Proof

Hancock argues that the Debtor must prove the requirements of § 1129(b) by clear and convincing evidence. *See In re Briscoe Enterprises, Ltd.*, 138 B.R. 795, 804 (N.D.Tex.1992) *and cases cited therein* (strict scrutiny required when property and property rights are "taken" under § 1129). The Debtor counters that the preponderance of evidence standard is appropriate in bankruptcy matters. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Holding that a debtor does not have a constitutional or fundamental right to a discharge, the Supreme Court reaffirmed that in civil actions between private litigants, preponderance of the evidence is the appropriate standard unless "particularly important individual interests or rights are at stake." *Grogan*, 498 U.S. at 286, 111 S.Ct. at 659, *quoting Herman & MacLean v. Huddleston*, 459 U.S. 375, 389–90, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983). It is unnecessary for this Court to decide whether § 1129(b) falls within the exception laid out in *Grogan* because the Debtor has not met its burden under either standard. *See In re Consul Restaurant Corp.*, 146 B.R. 979, 988 (Bankr.D.Minn. 1992) (declining to adopt clear and convincing standard; debtor did not meet burden under preponderance standard).

### 2. Applicable Interest Rate

The first task is to select the applicable base, or risk-free, rate from which a risk adjustment must be made. Ibbotson's concept of "duration" is sound. Ricks, called as a rebuttal witness, concurred that Ibbotson's methodology is a "respectable refinement", though he believed the applicable duration to be something less than 7.5 years. Because Ricks offered no evidence to support a shorter duration, this Court accepts ten-year treasury bonds, with a duration of 7.5 years, to be the source of the applicable risk-free base rate. (*See* footnote 15, above, discussing the concept of duration.)

The difficult question is how many basis points should be added to the base rate to account for risk. After adding Hancock's "profit" back to Mills' and Ricks' estimates, the Debtor's experts propose adding between 150 and 160 basis points to the treasury rate. This is so, even though Ricks testified about market rates for standard loans between 8.78 and 8.85%, ignoring the highest market rate of 9.5%. These market rates represent risk-adjustments for *standard* loans of between approximately 175 to 250 basis points. Therefore, the Debtor urges that this Court find *lower* risk for a loan with an initial loan-to-value ratio of 1:1 and debt service coverage of just over 1.0, than for a market assessed loan with 20% to 30% equity and debt service coverage of approximately 1.25.

The Debtor's rationale, supported by its experts' testimony, is that the plan proposal is safer than ordinary market loans. Because of the adversarial process (discovery, testimony under oath, expert inspections, etc.), the details of the Property are better known than in the usual procedure for considering requests for financing in the market. The Property has an operating history, unlike new projects (but not unlike properties for which refinancing is sought). All this means, according to the Debtor, is that the projections here are more certain than for ordinary market transactions, and, therefore, there is less risk. The Debtor's experts, in other words, focused on the Property and paid little attention to how the market would react to a 100% loan with minimal debt service coverage. Thus, the Debtor's experts averaged 155 basis points over the risk-free rate.

Hancock's experts, on the other hand, tended to disregard the characteristics of the Property, but focused on their assessments of the probable market reactions to loans with financial terms similar to the plan. Using this approach, they arrived at risk adjustments much higher than those sponsored by the Debtor's experts. Hancock's experts averaged 462 basis points over the risk-free rate: Ibbotson's risk-adjustment is 543 basis points; Palatnik's is

428 basis points; and Tung's adjustment is 415 basis points. Palatnik also testified that ordinary market rates reflect adjustments between 200 and 250 basis points; Tung found market rates between 162 and 212 basis points above the risk-free rate [16].

 There is merit in the approaches of both parties. But there are also significant problems. Based on all of the evidence, this Court cannot accept a fair and equitable rate that is *below* rates on standard loans, where the market is at least semi-efficient. Even though the cash flows are of good quality and reasonably certain, they are not absolutely certain. Professor Mills is probably right about what the future holds. But, since the future is inherently uncertain, he might be wrong. Inadequate equity cushion and debt coverage are inherent financial risks when the cash flows are not absolutely certain. This is especially true for the first $2,500,000 (or 25%) of the loan for the first three to four years of the plan when the Debtor's projections leave almost no room for the possibility that its underlying assumptions turn out to be less than exactly accurate. The presence of greater risk during the early years was openly acknowledged by Mills and grudgingly noted by Ricks. Neither expert, however, explained to the Court why Hancock should receive a constant rate of 8% throughout the term of the cram-down note.

On the other hand, Hancock's experts presented their testimony as though the financial risks to Hancock during the first few plan years would be constant during the term of the cram-down note. Ibbotson and Palatnik both offered somewhat vague testimony regarding comparables without focusing on the Property itself or the relative certainty of the cash flows. Rather, they examined the structure of the transaction and found risks of a type similar to corporate bonds. It may be that some types of corporate bonds have financial

risks similar to the Property; however, Hancock's experts did not analyze the security underlying payment of the corporate bonds in comparison to the quality of the Property and its cash flows. In short, the Debtor understates the risk to Hancock, and Hancock overstates it.

 There is no magic formula for solving the "value" problem presented by § 1129(b). In the absence of a reliable market, all this Court can do is to consider all the evidence supporting both approaches and then attempt to arrive at a reasonable answer, firmly based on that evidence. *See generally Oaks Partners*, 135 B.R. at 447. The Court finds that there must be some reasonable adjustment for risk beyond that offered by the Debtor, particularly compensating Hancock for the additional risk in the first three to four years of the plan. Finding that there is above-market risk to Hancock during the first three to four years of the plan, this Court finds that an appropriate, constant risk-adjustment for the Hancock loan is within the range of 325 to 350 basis points. While this finding is particularly fact-specific, this Court notes the recent findings of other courts faced with making a risk-adjustment for 100% loans. *Id.* (3% over treasury); *Computer Optics*, 126 B.R. at 672 (4% over treasury); *IPC Atlanta Ltd. Partnership*, 142 B.R. at 558 (3% over risk-free rate).

Methodology suggested by Palatnik is useful here—treating the Hancock loan as 75% debt, 25% equity. It would be more accurate, however, to treat the Hancock loan as two loans: a first mortgage loan for $7,500,000 and a second mortgage loan for $2,500,000. With respect to the first mortgage loan, if this were the only loan, the parties should agree that it would qualify as a relatively high grade loan. As Mills persuasively testified, the DuPage County real estate market has likely hit bottom and is on its way back up. The

---

**16.** Making a determination of basis points over the risk-free rate involves some guesswork, since it is not clear from the evidence what the treasury rate was at the time the market rates were quoted. This Court will assume that the market rates found by each witness were quoted

based on the treasury rate testified to by each witness. This likely will not be perfect, given the time lapse between the generation of market quotations and each witness' testimony; however, "we are not looking for perfection." *Oaks Partners*, 135 B.R. at 447.

Property is virtually fully occupied and the Debtor's projections of future income growth (at 3% for the first year, 4% thereafter) are conservative. Indeed, in its post-trial memorandum, Hancock conceded that the Property would be "an ideal candidate for reorganization ... if this Property's NOI [net operating income] could support the debt load...."

■■■■ As noted, all experts found market rates for loans on standard terms of 70% to 80% of value to be between 162 and 250 basis points over the risk-free rate. All of the market rate comparables suffer, however, from the possible inclusion of fees for applications, appraisals, documentation and "points" and, therefore, should be adjusted downward. *See In re Shannon*, 100 B.R. 913, 937 (S.D.Ohio 1989). Moreover, as the Debtor argues, the projections here have been more fully developed and examined than in a typical market loan, and are therefore more reliable. However, there are also reasons to adjust the rate upwards: the Debtor's prepayment ability, a thirty-year amortization and a twelve-year term. Based on the evidence provided by all the experts, this Court estimates a risk-adjustment for the first $7,500,000 of the Hancock loan of 200 basis points.

The interest rate for balance of the loan, $2,500,000, is obviously much more difficult to assess. Palatnik's two telephone quotes of 15% and 20% are of little help. Indeed, these quotes smack of the coerced loan type of evidence. *See Computer Optics*, 126 B.R. at 671 n. 10 (it would not be difficult to have ten lenders testify that they would charge 20% or more if forced to make a cram-down loan). Further, these rates were for equity, not a second mort-gage. Ibbotson's testimony about high-yield corporate bonds is more helpful but it, too, has problems. The Debtor adequately demonstrated that Ibbotson engaged in no independent analysis of the risks of each corporate bond nor the probability of the Debtor's projected cash flows. Further, even if Ba bond rates are comparable to the Hancock loan, Ibbotson did not testify what bond comparable he would use if only analyzing a second mortgage for $2,500,-000.

■■■ Ibbotson's basis point adjustment of 543 basis points (4.13% default risk, 1.3% prepayment risk) is instructive, however. Using this Court's adjustment of 200 basis points for 75% of Hancock's loan, Ibbotson's adjustment of 543 points implies an adjustment of 1,572 basis points for the 25% portion[17]. Similarly, Palatnik and Tung found risk-adjustments of 429 basis points and 415 basis points, respectively. Using 200 basis points for 75% of the loan, Palatnik's and Tung's total adjustments imply an average risk-adjustment of 1,088 for 25% of the loan. Using a risk-free rate of between 6% and 7%, this evidence implies a 16%—22% rate for the 25% loan, rates close to Palatnik's two equity bids of 15% and 20%. Using this blended-rate methodology further exposes the inappropriateness of the Debtor's overall 8% rate. The Debtor's *total* adjustments of 150 to 160 basis points yield impossibly low implied adjustments of between 0 and 40 basis points for the 25% loan. But again, the Debtor's implied adjustment appears too low and Hancock's appears too high. Therefore, on the 25% loan, this Court estimates a range of 700 to 800 basis points to be an appropriate adjustment for risk.

## SPLIT–LOAN RISK ADJUSTMENT ANALYSIS

| Expert | Assumed 75% Component | Implied 25% Component | Weighted Risk Adjustment |
|---|---|---|---|
| Ibbotson | 200 basis points | 1,572 basis points | 543 basis points |
| Palatnik | 200 | 1,116 | 429 |
| Tung | 200 | 1,060 | 415 |
| P & T (average) | 200 | 1,088 | 422 |
| Mills | 200 | 0 | 150 |
| Ricks | 200 | 40 | 160 |

**17.** This can be solved as follows: $(200)(.75) + (x)(.25) = 543$ basis points. Solving for "x", the risk-adjustment for the 25% subordinate mortgage rate would be 1,572 basis points. This is even higher than Palatnik's highest equity bid of 20%, or approximately 1,300 basis points above the risk-free rate.

Taking the separate loans and stating them as one, the weighted risk-adjustment falls within the range of 325 to 350 basis points (200 basis points for 75% first mortgage and 700 to 800 for 25% second mortgage). Further, applying Tung's "certainty equivalents discounting" approach, a risk-free rate plus approximately 325 to 350 basis points falls within Tung's 97% to 98% certainty equivalents range, the historical average. As Tung explained, his methodology operates as a check on the interest rate selected. A third "check" on this Court's risk adjustment is to view the Hancock loan as a series of twelve one-year loans that become less risky over time given the increased debt coverage and collateral value. Depending on current treasury rates, adding between 325 and 350 basis points yields a constant risk-adjusted rate of approximately 9.5%. (The May, 2003 treasury bond yield as of June 4, 1993, is 6.07%.) That rate also is roughly the equivalent of a series of one-year loans at approximately 13%, 12%, 11% and 10% for the first four years of the plan and 8.25% thereafter. Again, that results in a more reasonable risk adjusted rate than the flat 8% proposed by the Debtor.

The Court therefore finds that the plan is not fair and equitable with respect to Hancock.

## VI. OTHER CONFIRMATION ISSUES

Hancock has raised a multitude of objections to the pending plan, including many that have been disposed of in court. All of Hancock's objections have been considered, with the most significant ones more fully addressed in this opinion. A few more warrant brief comment. Hancock placed a great deal of emphasis during confirmation on the issue of feasibility. See § 1129(a)(11). Even had this Court accepted 8% as the appropriate fair and equi-

table interest rate, Hancock argues that the Debtor's projections are flawed, both with respect to annual cash flow and the ultimate sale or refinancing of the Property. But this Court has rejected 8%. Therefore, Hancock's numerous and detailed objections regarding cash flows need not be resolved because it is clear that the plan, as structured, is clearly not feasible when the appropriate interest rate is applied.

A related objection is that the plan does not provide for payment in full for administrative expenses, specifically the Debtor's attorneys' fees. Further, Hancock complains that the general partners are the transferees of voidable preferences. The resolutions of these objections are related. The Debtor's attorneys have entered into an agreement with the general partners for the payment of their fees. Counsel has, in effect, waived their right to priority payment under the plan. If this Court concluded that the Debtor should pursue preferential payments to its partners, those funds simply would be paid into the estate for administrative expenses. Either way, the general partners will be paying the administrative expenses.

Next, Hancock claims that the plan is not fair and equitable because, among other reasons, the plan enables the general partners to receive full payment on the Fleet and Morris claims that they acquired at less than 50% of the aggregate face value. Because the Fleet and Morris claims will be paid under the plan over time without interest, the Debtor contends that the plan reflects "no extraordinary return". Any return beyond what it would have cost the partnership to borrow money to buy out the Fleet and Morris claims would raise partnership fiduciary issues, as well as fair and equitable concerns under § 1129(b).[18] Indeed, this Court would be reluctant to

---

**18.** This Court also notes that the settlement agreement among the general partners and Morris provided for the cancellation of the partnership note in exchange for notes from the general partners. The form of this transaction is closer to a loan to the partnership than the

Fleet transaction. However, regardless of the form, both transactions should be viewed as loans from the partners to the partnership to pay Fleet and Morris, with the loans earning an arms-length rate of interest.

permit the general partners to receive any more than the Seventh Circuit suggested under substantially similar circumstances: plan payments on the purchased claims may not exceed the consideration paid by the general partners plus an appropriate rate of interest. *See Matter of Gladstone Glen*, 739 F.2d 1233, 1237–38 (7th Cir.1984) (debtor's general partners purchased claims to secure consent to plan; partners not entitled to assert face amount of claims, only consideration paid plus interest). *Compare* § 509(a). Therefore, were this plan otherwise confirmable, the Debtor would have to modify its treatment of the Fleet and Morris claims.

The balance of Hancock's objections are less significant and moot given this Court's conclusion regarding the size of Hancock's claim and the interest rate required under § 1129(b)(2)(A)(i)(II). The more pertinent inquiry is whether, as a result of this Court's findings, the automatic stay should be lifted to permit Hancock to continue its state law foreclosure proceedings.

## VII. MOTION TO LIFT STAY

Hancock has requested relief from the automatic stay pursuant to § 362(d)(2). Hancock has met its burden that the Debtor lacks equity in the Property. *See* §§ 362(d)(2)(A) and 362(g)(1). The Debtor has the burden of proving that the Property is "necessary to an effective reorganization." *See* §§ 362(d)(2)(B) and 362(g)(2). The Supreme Court has interpreted the Debtor's burden as proving a "reasonable possibility of a successful reorganization within a reasonable time," and that the Property is necessary for that reorganization. *Timbers*, 484 U.S. at 376, 108 S.Ct. at 632. That there would be no reorganization without the Property is perhaps the only area of agreement between the parties. *In re 266 Washington Associates*, 141 B.R. 275, 281 (Bankr.E.D.N.Y.1992), *aff'd.*, 147 B.R. 827 (E.D.N.Y.1992). Therefore, the inquiry is limited to whether there is a realistic prospect of an effective reorganization. *Timbers*, 484 U.S. at 376, 108 S.Ct. at 633; *see also In re Highland Park Assoc. Ltd. Partnership*, 130 B.R. 55, 57 (Bankr.N.D.Ill.1991).

Hancock argues that the Debtor can put forth no plan that has any realistic chance of being confirmed. This is so, Hancock argues, because the cash flows and underlying property value are inadequate to pay Hancock's claim and the other claims under the plan, especially considering Hancock's view that the Debtor has underestimated future capital repair and maintenance requirements. However, this Court feels that the Debtor's reserves generally are adequate. The real issue is whether the Debtor can propose a confirmable plan that pays Hancock the required interest rate. Indeed, Hancock's other objections pale in comparison.

In this regard, the Debtor suggests that "given the Property's operating strength, the Debtor should be permitted to address any specific aspects of the instant Plan that the Court may raise." (Debtor's Post-trial Response Memorandum at 10). It is not this Court's role to propose a minimally confirmable plan. The Debtor's statement is more a request for a continuance than proof of the Debtor's ability to confirm a plan. If resolution of Hancock's motion rested on this request alone, this Court would be reluctant to accede to the Debtor's wish.

However, on January 8, 1993, three days before this Court resumed confirmation hearings, the general partners filed a liquidating plan (perhaps as a defensive measure against Hancock's motion for relief from the stay). Their plan purports to subordinate Hancock's claim to Fleet's, based on the following stupefying language in the subordination agreement that otherwise purported to subordinate Fleet's claim to Hancock's: "[t]his agreement shall not be binding on any court having jurisdiction under the U.S. Bankruptcy Code, 11 U.S.C. § 101, *et seq.*". Hancock summarily concludes that this plan cannot defeat their motion because the liquidating plan was filed in bad faith. Further, Hancock argues that there can be no assenting class for the liquidating plan without Hancock's affirmative vote because the Fleet and Morris claims are now held by insiders.

The Debtor counters that Hancock ignores the non-insider claims of the two law firms.

During the confirmation hearings, both Hancock and the Debtor focused almost exclusively on the Debtor's pending plan, neither party adequately discussing the effect of the general partners' plan. This necessitates a more substantial inquiry into whether, based on the general partners' plan, there is a reasonable possibility of an effective reorganization (in the form of an orderly liquidation) within a reasonable time. *Compare In re Schlangen*, 91 B.R. 834, 838 (Bankr.N.D.Ill.1988) (liquidation is legitimate purpose of a Chapter 11 case). Therefore, the hearing on Hancock's motion to lift the automatic stay will be continued until June 23, 1993. The continued hearing also will give the Debtor a last chance to convince this Court that it can successfully reorganize by restructuring Hancock's debt in accordance with the requirements of the Code. *See generally In re Orfa Corp. of Philadelphia*, 129 B.R. 404, 426 (Bankr.E.D.Pa.1991) (citing "last chance" cases).

## VIII. CONCLUSION

For the foregoing reasons, this Court will deny Hancock's motion to withdraw its § 1111(b) election and will deny confirmation of the Debtor's modified second amended plan. A final hearing on June 23, 1993, is scheduled for Hancock's motion for relief from the automatic stay.

## APPENDIX A

FD:23WORK\BLOOMINGDALE\ROUND6\RUN6B 1.5.93
3% GROWTH FIRST YEAR 4% THEREAFTER—
$10,000,000 FIRST MORTGAGE 8% RATE 2 YEARS INTEREST ONLY

BLOOMINGDALE PARTNERS
SCHEDULE A
FORECAST OF ECONOMICS OF OPERATIONS
1993–2007

| | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| EFFECTIVE GROSS INCOME | $1,630,200 | 1,679,100 | 1,746,300 | 1,816,200 | 1,888,800 |
| TOTAL OPERATING EXPENSES | 776,500 | 799,800 | 831,800 | 865,100 | 899,700 |
| CASH FLOW BEFORE DEBT SERVICE | 853,700 | 879,300 | 914,500 | 951,100 | 989,100 |
| DEBT SERVICE: | | | | | |
| PRINCIPAL AND INTEREST ON HANCOCK LOAN ($ 10,000,000: 8.00% 2YR IO. THEN 30 YR.SCH.) | 800,000 | 800,000 | 880,500 | 880,500 | 880,500 |
| TOTAL DEBT SERVICE | 800,000 | 800,000 | 880,500 | 880,500 | 880,500 |
| CASH FLOW AFTER DEBT SERVICE | 53,700 | 79,300 | 34,000 | 70,600 | 108,600 |

DISTRIBUTION OF CASH FLOW TO UNSECURED CREDITORS:

| CREDITOR: | TOTAL DUE | PERCENTAGE | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|---|
| FLEET NATIONAL BANK | 2,261,300 | 64.2433% | 34,499 | 50,945 | 21,843 | 45,356 | 69,768 |
| DON MORRIS LAND LOAN | 700,000 | 19.8869% | 10,679 | 15,770 | 6,762 | 14,040 | 21,597 |
| PCRM, INC. | 543,800 | 15.4493% | 8,296 | 12,251 | 5,253 | 10,907 | 16,778 |
| HOLLEB AND COFF | 8,300 | 0.2358% | 127 | 187 | 80 | 166 | 256 |
| KMZ | 6,500 | 0.1847% | 99 | 146 | 63 | 130 | 201 |
| TOTAL | 3,519,900 | 1.0000 | 53,700 | 79,300 | 34,000 | 70,600 | 108,600 |

REMAINING YEAR END BALANCE OF OUTSTANDING OBLIGATIONS:

| | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| HANCOCK | 10,000,000 | 10,000,000 | 9,916,464 | 9,825,994 | 9,728,015 |
| FLEET NATIONAL BANK | 2,226,801 | 2,175,856 | 2,154,014 | 2,108,658 | 2,038,890 |
| DON MORRIS LAND LOAN | 689,321 | 673,550 | 666,789 | 652,749 | 631,151 |
| PCRM, INC. | 535,504 | 523,252 | 518,000 | 507,092 | 490,315 |
| HOLLEB AND COFF | 8,173 | 7,986 | 7,906 | 7,740 | 7,484 |
| KMZ | 6,401 | 6,254 | 6,192 | 6,061 | 5,861 |
| TOTAL ALL OBLIGATIONS | 13,466,200 | 13,386,900 | 13,269,364 | 13,108,294 | 12,901,715 |

| PROPERTY VALUE USING 9.00% CAP RATE | 9,485,600 | 9,700,000 | 10,161,100 | 10,567,800 | 10,990,000 |

| | | 1993 | 1994 | 1995 | 1996 | 1997 |
|--------------------------|---------|------|-----------|-----------|-----------|-----------|
| INDICATED EQUITY | | | | | | |
| FUTURE LOAN AMOUNT | | | | | | |
| (9.00%—25 YR.—1.25×) | | | 6,985,224 | 7,264,855 | 7,555,609 | 7,857,483 |
| (9.25%—25 YR.—1.25×) | | | 6,845,065 | 7,119,086 | 7,404,005 | 7,699,823 |
| (9.5%—25 YR.—1.25×) | | | 6,709,653 | 6,978,253 | 7,257,535 | 7,547,501 |

| | | 1998 | 1999 | 2000 | 2001 | 2002 |
|--------------------------|---------|------|-----------|-----------|-----------|-----------|
| EFFECTIVE GROSS INCOME | | 1,964,400 | 2,043,000 | 2,124,700 | 2,209,700 | 2,298,100 |
| TOTAL OPERATING EXPENSES | | 935,700 | 973,100 | 1,012,000 | 1,052,500 | 1,094,600 |
| CASH FLOW BEFORE DEBT SERVICE | | 1,028,700 | 1,069,900 | 1,112,700 | 1,157,200 | 1,203,500 |

DEBT SERVICE:
PRINCIPAL AND INTEREST ON HANCOCK LOAN
($ 10,000,000: 8.00% 2YR IO, THEN 30 YR.SCH.)

| | | | 880,500 | 880,500 | 880,500 | 880,500 | 880,500 |
|--------------------------|---------|--|---------|---------|---------|---------|---------|
| TOTAL DEBT SERVICE | | | 880,500 | 880,500 | 880,500 | 880,500 | 880,500 |
| CASH FLOW AFTER DEBT SERVICE | | | 148,200 | 189,400 | 232,200 | 276,700 | 323,000 |

DISTRIBUTION OF CASH FLOW TO UNSECURED CREDITORS:

| CREDITOR: | TOTAL DUE | PER-CENT-AGE | | | | | |
|----------------------|-----------|--------------|---------|---------|---------|---------|---------|
| FLEET NATIONAL BANK | 2,261,300 | 64.2433% | 95,209 | 121,677 | 149,173 | 177,761 | 207,506 |
| DON MORRIS LAND LOAN | 700,000 | 19.8869% | 29,472 | 37,666 | 46,177 | 55,027 | 64,235 |
| PCRM, INC. | 543,800 | 15.4493% | 22,896 | 29,261 | 35,873 | 42,748 | 49,901 |
| HOLLEB AND COFF | 8,300 | 0.2358% | 349 | 447 | 548 | 652 | 762 |
| KMZ | 6,500 | 0.1847% | 274 | 350 | 429 | 511 | 596 |
| TOTAL | 3,519,900 | 1.0000 | 148,200 | 189,400 | 232,200 | 276,700 | 323,000 |

REMAINING YEAR END BALANCE OF OUTSTANDING OBLIGATIONS:

| HANCOCK | 9,621,904 | 9,506,986 | 9,382,529 | 9,247,743 | 9,101,770 |
|-----------------------|------------|------------|------------|------------|------------|
| FLEET NATIONAL BANK | 1,943,681 | 1,822,004 | 1,672,831 | 1,495,070 | 1,287,564 |
| DON MORRIS LAND LOAN | 601,679 | 564,013 | 517,836 | 462,809 | 398,574 |
| PCRM, INC. | 467,419 | 438,158 | 402,284 | 359,536 | 309,635 |
| HOLLEB AND COFF | 7,134 | 6,688 | 6,140 | 5,488 | 4,726 |
| KMZ | 5,587 | 5,237 | 4,808 | 4,298 | 3,701 |
| TOTAL ALL OBLIGATIONS | 12,647,404 | 12,343,086 | 11,986,429 | 11,574,943 | 11,105,971 |

| PROPERTY VALUE USING | 9.00% CAP RATE | 11,430,000 | 11,887,800 | 12,363,300 | 12,857,800 | 13,372,200 |
|----------------------|----------------|------------|------------|------------|------------|------------|
| INDICATED EQUITY | | | | 376,871 | 1,282,857 | 2,266,229 |

FUTURE LOAN AMOUNT

| (9.00%—25 YR.—1.25x) | 8,172,069 | 8,499,364 | 8,839,371 | 9,192,882 | 9,560,693 |
|----------------------|-----------|-----------|-----------|-----------|-----------|
| (9.25%—25 YR.—1.25x) | 8,008,096 | 8,328,825 | 8,662,009 | 9,008,427 | 9,368,857 |
| (9.5%—25 YR.—1.25x) | 7,849,676 | 8,164,060 | 8,490,652 | 8,830,217 | 9,183,518 |

| | 2003 | 2004 | 2005 | 2006 | 2007 |
|--------------------------|------|-----------|-----------|-----------|-----------|
| EFFECTIVE GROSS INCOME | 2,390,000 | 2,485,600 | 2,585,000 | 2,688,400 | 2,795,900 |
| TOTAL OPERATING EXPENSES | 1,138,400 | 1,183,900 | 1,231,300 | 1,280,600 | 1,331,800 |
| CASH FLOW BEFORE DEBT SERVICE | 1,251,600 | 1,301,700 | 1,353,700 | 1,407,800 | 1,464,100 |

DEBT SERVICE:
PRINCIPAL AND INTEREST ON HANCOCK LOAN
($ 10,000,000: 8.00% 2YR IO. THEN 30 YR. SCH.)

| | | 880,500 | 880,500 | 880,500 | 880,500 | 880,500 |
|--------------------------|--|---------|---------|---------|---------|---------|
| TOTAL DEBT SERVICE | | 880,500 | 880,500 | 880,500 | 880,500 | 880,500 |
| CASH FLOW AFTER DEBT SERVICE | | 371,100 | 421,200 | 473,200 | 527,300 | 583,600 |

DISTRIBUTION OF CASH FLOW TO UNSECURED CREDITORS:

| CREDITOR: | TOTAL DUE | PER-CENT-AGE | | | | | |
|---------------------|-----------|--------------|---------|---------|---------|---------|---------|
| FLEET NATIONAL BANK | 2,261,300 | 64.2433% | 238,407 | 270,593 | 303,999 | 338,754 | 135,811 |

| CREDITOR: | TOTAL DUE | PER-CENT-AGE | 1993 / 2003 | 1994 / 2004 | 1995 / 2005 | 1996 / 2006 | 1997 / 2007 |
|---|---|---|---|---|---|---|---|
| DON MORRIS LAND LOAN | 700,000 | 19.8869% | 73,800 | 83,764 | 94,105 | 104,864 | 42,041 |
| PCRM, INC. | 543,800 | 15.4493% | 57,332 | 65,072 | 73,106 | 81,464 | 32,660 |
| HOLLEB AND COFF | 8,300 | 0.2358% | 875 | 993 | 1,116 | 1,243 | 498 |
| KMZ | 6,500 | 0.1847% | 685 | 778 | 874 | 974 | 390 |
| TOTAL | 3,519,900 | 1.0000 | 371,100 | 421,200 | 473,200 | 527,299 | 211,402 |

REMAINING YEAR END BALANCE OF OUTSTANDING OBLIGATIONS:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| HANCOCK | | | 8,943,681 | 8,772,470 | 8,587,050 | 8,386,239 | 8,168,761 |
| FLEET NATIONAL BANK | | | 1,049,157 | 778,565 | 474,566 | 135,811 | 0 |
| DON MORRIS LAND LOAN | | | 324,773 | 241,010 | 146,905 | 42,041 | 0 |
| PCRM, INC. | | | 252,303 | 187,230 | 114,124 | 32,660 | 0 |
| HOLLEB AND COFF | | | 3,851 | 2,858 | 1,742 | 498 | 0 |
| KMZ | | | 3,016 | 2,238 | 1,364 | 390 | 0 |
| TOTAL ALL OBLIGATIONS | | | 10,576,782 | 9,984,372 | 9,325,751 | 8,597,642 | 8,168,762 |
| PROPERTY VALUE USING | 9.00% | CAP RATE | 13,906,700 | 14,463,300 | 15,041,100 | 15,642,200 | 16,267,800 |
| INDICATED EQUITY | | | 3,329,918 | 4,478,928 | 5,715,349 | 7,044,558 | 8,099,038 |

FUTURE LOAN AMOUNT

| | | | | | |
|---|---|---|---|---|---|
| (9.00%—25 YR.—1.25x) | 9,942,803 | 10,340,801 | 10,753,893 | 11,183,667 | 11,630,918 |
| (9.25%—25 YR.—1.25x) | 9,743,300 | 10,133,313 | 10,538,116 | 10,959,267 | 11,397,544 |
| (9.5%—25 YR.—1.25x) | 9,550,553 | 9,932,850 | 10,329,645 | 10,742,465 | 11,172,072 |