**In re BLOOMINGDALE PARTNERS, an Illinois limited partnership, Debtor.**

**Bankruptcy No. 91 B 11678.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Oct. 21, 1993.

secret joke
94

Gregory G. Wrobel, Mitchell G. Jones, John D. Malarkey, Michael L. Kayman, Vedder, Price, Kaufman & Kammholz, James L. Lucari, Holleb & Coff, Chicago, IL, for debtor.

Philip V. Martino, Rudnick & Wolfe, Chicago, IL, for debtor's General Partners.

Peter A. Sarasek, Leonard S. Shifflett, Thomas J. Magill, Todd A. Rowden, Wilson & McIlvaine, Chicago, IL, for John Hancock Mut. Life Ins. Co.

David J. Fisher, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Fleet Nat. Bank.

Joseph J. Casper, The Jeff Diver Group, Glen Ellyn, IL, for John and Jean Zarlenga.

Katy Gleason, Dept. of Justice, U.S. Trustee's Office, Chicago, IL, for U.S. Trustee.

### AMENDED MEMORANDUM OPINION

RONALD BARLIANT, Bankruptcy Judge.

## I. INTRODUCTION

On June 7, 1993, this Court issued an opinion denying John Hancock Mutual Life Insurance Company's motion to withdraw its § 1111(b)[1] election and denied confirmation of the Debtor's modified second amended plan. Subsequently, the Debtor filed a third plan in opposition to Hancock's motion for relief from the stay. After this Court denied Hancock's § 362 motion, the parties filed additional motions raising the following issues with respect to the pending third plan: (1) whether Hancock has a new option to make the § 1111(b) election; (2) whether post-petition net rents paid to Hancock should be allocated to post-petition accrued interest; (3) whether the Debtor should be permitted to place post-petition rents into an escrow for contingent environmental remedial work; and (4) whether two Chicago law firms

---

1. Statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

should be deemed "insiders" given their pre- and post-petition relationship with the Debtor and its general partners.

For the reasons discussed below, this Court concludes that (a) the § 1111(b) election issue is moot because post-petition net rents have increased Hancock's allowed secured claim, which is measured as of confirmation, so that there is no longer an undersecured portion; (b) Hancock is allowed post-petition interest to the extent that net rents, when added to the value of the balance of Hancock's collateral, exceed the amount of Hancock's allowed claim; (c) post-petition net rents received by Hancock shall be deemed to be prepayments of its allowed secured claim plus allowed interest; (d) funds may be placed into an interest-bearing escrow account for contingent liabilities in the nature of conditional § 506(c) charges, with a reversionary right in favor of Hancock for any unused escrow balance; and (e) the two Chicago law firms are not insiders of the Debtor.

## II. BACKGROUND

The extensive background of this case is more fully set forth in *In re Bloomingdale Partners*, 155 B.R. 961, 965–68 (Bankr. N.D.Ill.1993) (hereinafter, *"Bloomingdale I"*). In May, 1991, when the Debtor filed a voluntary chapter 11 petition, Hancock held a claim in the amount of approximately $11,160,000. This Court later determined the value of Hancock's security interest in the Debtor's apartment building to be $10,000,000 for purposes of confirmation. Ignoring for the moment accrued post-petition rents, this left Hancock with a secured claim in the amount of $10,000,000 and an unsecured claim in the amount of $1,160,000. *See* § 506(a).

A significant issue in *Bloomingdale I* was Hancock's § 1111(b) election, converting its entire allowed claim ($11,160,000) into a "secured claim" and waiving its "unsecured claim." When it became aware that the Debtor's general partners had purchased unsecured claims, Hancock realized that it would be able to control the vote of the unsecured class if it could rescind its § 1111(b) election. *See* § 1129(a)(10) (votes

cast by insiders not counted for determining acceptance by class). This Court denied Hancock's request to undo its election "with respect to the plan." *See* Fed.R.Bankr.P. 3014. Subsequently, the Debtor filed its *third* plan of reorganization. Now Hancock has renewed its efforts to assert an unsecured claim because, in order to confirm its plan, the Debtor needs the assenting vote of the class of unsecured creditors, excluding the votes of insiders. Other than claims now held by the Debtor's general partners, two minor unsecured claims are held by two Chicago law firms. If the law firms are deemed insiders whose assenting votes are not counted, or if Hancock is deemed the holder of an unsecured claim, the Debtor will be unable to confirm its current plan for lack of an assenting impaired class.

Hancock, however, has a substantial hurdle to overcome before it can assert any unsecured claim: the Debtor has paid Hancock post-petition net rents in an amount exceeding $1,160,000, the amount of its petition-date unsecured claim. Hancock further has to contend with this Court's prediction that "after the Debtor accounts to Hancock for all security interests, ... it may not be too long (if not already) before Hancock's security exceeds its claim [and] the entire § 1111(b) issue would be moot." *Bloomingdale I*, 155 B.R. at 976 n. 11. This Court made that observation in connection with the Debtor's attempt to "cram-down" Hancock's claim. As part of that attempt, the Debtor's modified second amended plan proposed crediting post-petition payments of net rents against Hancock's petition-date secured claim. This Court concluded that post-petition net rents would constitute additional collateral, thereby reducing the extent to which Hancock's claim was not secured by the value of its collateral. This did not reduce, however, any "unsecured claim" of Hancock because Hancock no longer held the "unsecured claim" created by § 1111(b)(1)(A) after having made its § 1111(b)(2) election. Rather, this Court credited the payments made by the Debtor against the then increased total "allowed secured claim" payable under § 1129(b). *See id.* at 976. Hancock apparently feels that the issue of how to characterize the post-petition

payments has been reopened now that there are a new plan and § 1111(b) option.

Hancock's former § 1111(b) election, however, did not affect this Court's analysis of the proper allocation of post-petition rents. As explained in greater detail in *Bloomingdale I*, the § 1111(b) election has to do with the treatment and payment of the undersecured portion of the claim, not the secured portion. Regardless of the § 1111(b) election, Hancock had a right under § 1129(b) to receive the present value of the secured portion of its claim. That value equals the value of Hancock's collateral, including the rents. Thus, this Court's conclusions in *Bloomingdale I* that (1) post-petition net rents increased Hancock's secured claim (that is, the secured portion of its total claim); and (2) Hancock's receipt of such rents would be credited against Hancock's then larger allowed secured claim, had nothing to do with Hancock's election.[2]

Nevertheless, Hancock prefers to limit this Court's statements in *Bloomingdale I* to those that merely recognize Hancock's additional security interest in post-petition net rents. By ignoring the consequent analysis employed in *Bloomingdale I* that the "secured claim" grew and concomitantly reduced the undersecured portion, Hancock finds another use for its post-petition security interest in the net rents: post-petition interest. According to Hancock, its allowed claim of $11,160,000 is bifurcated as of the petition date into a secured claim of $10,000,-000 (the value of the building) and an unsecured claim of $1,160,000. Then, as additional collateral accrues in the form of net rents, the secured claim ($10,000,000) becomes oversecured, entitling Hancock to post-petition

interest under § 506(b). *See generally* David G. Carlson, *Time, Value, and the Rights of Secured Creditors in Bankruptcy, or, When Does Adequate Protection Begin?*, 1 J.Bankr.L. & Prac. 113, 128–29 (1992). Hancock makes this argument despite the fact that in *Bloomingdale I* the time of confirmation, not filing, was the reference point for purposes of determining the extent of Hancock's secured claim. *See Bloomingdale I*, 155 B.R. at 976; *see also In re Landing Assocs., Ltd.,* 122 B.R. 288, 297 (Bankr. W.D.Tex.1990) (valuing creditor's secured claim as of date of confirmation).[3]

These arguments require a determination of the extent of Hancock's secured claim.

## III. DETERMINATION OF HANCOCK'S SECURED CLAIM UNDER § 506(a)

There are at least three flaws in Hancock's argument that its claim is bifurcated as of the petition date into secured and unsecured claims, with the secured claim later becoming oversecured as a result of post-petition net rents: (1) Hancock fixes its "allowed secured claim" as of the petition date, in contravention of *Dewsnup v. Timm,* —— U.S. ——, ——, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992); (2) Hancock measures the extent of its collateral as of the effective date of confirmation for purposes of § 506(b), but measures the extent of its collateral as of the petition date for purposes of § 506(a); and (3) collection of post-petition interest while preserving an unsecured claim violates the principles stated in *United States Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 372–74, 108 S.Ct. 626, 631–32, 98 L.Ed.2d 740 (1988).

---

**2.** This Court said as much in *Bloomingdale I*, although perhaps too elliptically, when commenting that the value of Hancock's secured claim is the subject of § 1129(b) "[r]egardless of Hancock's § 1111(b) election." *Id.* at 977.

**3.** The Debtor argues that Hancock is prohibited from re-arguing the issue of how rents are to be allocated. While this Court agrees that statements from *Bloomingdale I* substantially undercut Hancock's position, Hancock is not precluded from raising this argument in connection with the Debtor's new third plan. Hancock's purpose here is to have the benefit of the post-petition rents *and* preserve its deficiency claim for voting

purposes. In *Bloomingdale I*, Hancock's tactic was slightly different given its prior § 1111(b) election. At that time, regardless of whether post-petition rents would be allocated against interest or the deficiency claim, Hancock still had such a large deficiency claim that it would control the class if only its § 1111(b) election were rescinded. This is because the Debtor then had not yet remitted in excess of $1,160,000 to Hancock. Only now that the Debtor has remitted in excess of $1,160,000 is it essential to Hancock that it argue for complete allocation of the post-petition rents against post-petition interest.

## A. Impact of *Dewsnup* on Valuation Timing Under § 506(a)

Prior to *Dewsnup*, courts split on whether § 506(a) determinations of secured status should be based on valuation of the collateral as of the petition date, or as of the effective date of confirmation. Ironically, Hancock's argument in favor of a petition-date valuation is usually made by debtors. *Compare In re Reddington/Sunarrow Ltd. Partnership*, 119 B.R. 809, 813 (Bankr. D.N.M.1990) (determining value of allowed secured claim as of petition date) *with In re Landing Assocs., Ltd.*, 122 B.R. 288, 297 (Bankr.W.D.Tex.1990) (determining value of allowed secured claim as of date of confirmation). *See generally* Carlson, above.

In *Dewsnup*, the Supreme Court ruled that, in a chapter 7 case, a debtor could not limit an allowed secured claim to the petition-date collateral value under § 506(a). Rather, "[a]ny increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain." *Dewsnup*, — U.S. at ——, 112 S.Ct. at 778. Therefore, *Dewsnup* confirms that the determination of the extent of secured status is a moving target, at least in chapter 7.

This conclusion controls the analysis in chapter 11 as well. Under § 1129(a)(7)(A)(ii), commonly referred to as the "best interest test," each holder of an impaired claim is entitled to "receive or retain under the plan on account of such claim or interest property of a value, *as of the effective date of the plan*, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title *on such date*." Since *Dewsnup* mandates that increases in the value of collateral accrue to the benefit of the secured creditor in chapter 7, the best interest test entitles the creditor in chapter 11 to at least the present value of its secured claim, as increased during the pendency of the case. Moreover, there is no apparent reason why increases in value should accrue to the creditor in chapter 7 cases but not in

chapter 11 cases. Therefore, the debate over valuation timing has been decided by *Dewsnup* in favor of the effective date of confirmation. This conclusion, ordinarily a boon for secured creditors, does not help Hancock in its mission to vote an unsecured claim, because the total value of its collateral now exceeds the amount of its allowed claim.

## B. Interrelationship Between Valuation Timing Under § 506(a) and § 506(b)

A separate flaw in Hancock's argument is that it enables Hancock to be both undersecured and oversecured at the same time: undersecured for purposes of blocking acceptance by the class of unsecured claims; oversecured for purposes of accruing interest on a portion of its claim. This "heads-I-win-tails-you-lose" approach requires that § 506(b) operate independently from § 506(a), instead of allowing a single determination of the "extent" of Hancock's collateral for both sections. Hancock prefers bifurcation under § 506(a) as of the petition date (an erroneous conclusion as discussed above). Then, as of the effective date of confirmation, a second valuation of Hancock's secured claim occurs, this time skipping over § 506(a) and proceeding immediately to § 506(b). Such statutory gymnastics are disfavored. Apart from the narrow holding in *Dewsnup* with respect to the meaning of "allowed secured claim" in the subsections (a) and (d) of § 506, this Court generally agrees with Justice Scalia that an allowed secured claim "obviously bears the meaning set forth in § 506(a) when it is used in ... § 506(b), which addresses 'allowed secured claim[s]' that are oversecured." *Dewsnup*, — U.S. at ——, 112 S.Ct. at 780 (Scalia, J., dissenting). Therefore, since Hancock's allowed claim cannot be undersecured for purposes of § 506(a) and oversecured for purposes of § 506(b), one determination must be made for both purposes and that determination occurs, as discussed above, as of the effective date of confirmation.

## C. Impact of *Timbers* on Using Encumbered Cash to Pay Interest

Hancock's argument also runs afoul of the Supreme Court's pronouncement that

§ 506 has the "substantive effect of denying *undersecured creditors* postpetition interest on their claims." *United States Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372, 108 S.Ct. 626, 631, 98 L.Ed.2d 740 (1988) (emphasis added). Despite this language, Hancock insists that *Timbers* is limited to precluding the use of *unencumbered* estate assets for the payment of post-petition interest. Because Hancock has a security interest in net rents, it contends that those rents can be used to pay interest notwithstanding the assertion by Hancock of its unsecured deficiency claim. Hancock cites *In re Vermont Inv. Ltd. Partnership*, 142 B.R. 571 (Bankr.D.D.C.1992). More recently, another bankruptcy court deemed *Timbers* inapplicable when an undersecured creditor is paid post-petition interest with secured rents. *See In re Birdneck Apartment Assocs., II, L.P.*, 156 B.R. 499, 505 (Bankr. E.D.Va.1993) ("Debtor's argument interprets *Timbers* too broadly....").

Hancock cites *Vermont* out of the proper context. There, the creditor moved for relief from the automatic stay, alleging lack of adequate protection. The debtor countered that adequate protection existed in the form of an equity cushion created by paying down the secured claim with post-petition net rents. As did this Court in *Bloomingdale I*, the court in *Vermont* declared that the debtor's argument failed to recognize the rents as additional collateral under § 552. That court then generalized that the increased rents created additional collateral, dollar for dollar, to pay post-petition interest accruals under § 506(b). The petition-date portion of the creditor's claim secured by the real estate, therefore, was not reduced by the debtor's payments and remained inadequately protected. As the only issue before it was whether the automatic stay should be lifted because of inadequate protection, the *Vermont* court did not discuss whether post-petition rents should have been paid first to reduce the unsecured, deficiency claim. The result, for purposes of § 362, would have

been the same: the post-petition payments would have reduced the undersecured portion, not the portion secured by the real estate, rendering that latter portion equally inadequately protected. Therefore, *Vermont* is not authority for paying post-petition interest *and* preserving an unsecured, deficiency claim.[4]

*Birdneck* is more problematic. There, the debtor argued that post-petition rents paid to the creditor should have been allocated to reduce the creditor's unsecured deficiency claim. That court rejected the debtor's argument, concluding that the "adequate protection" payments belonged to the creditor. Further, the court, citing *Vermont* and *Landing*, remarked that even if the additional rents were considered additional collateral, there would be no offset against the deficiency claim since the rents were first subsumed by post-petition interest under § 506(b). The *Birdneck* court specifically found *Timbers* inapplicable, since the interest would be paid from encumbered rents, not unencumbered assets. This latter conclusion is especially confounding given that the court chose to value the creditor's secured claim as of confirmation. *Birdneck*, 156 B.R. at 503. Thus, had the Debtor adequately protected the creditor's interests in the rents by placing them in an interest-bearing escrow, the § 506 valuation, *having taken place as of confirmation*, would have included the rents and eliminated the deficiency claim.

This Court rejects the anti-*Timbers* argument made in *Birdneck* and asserted here by Hancock. Aside from using the petition date under § 506(a) and the effective date of confirmation under § 506(b), this argument amounts to an interest payment shell game. According to Hancock, "unencumbered assets of the bankruptcy estate are not adversely affected. Following application of Rents to interest accruals, the estate will have exactly the same assets as it did at the time this case was filed. No creditor has been harmed." (Hancock Mem. at 6.) Hancock seems to forget that at the time the case

---

4. The *Vermont* court reference to dollar for dollar allocation of rents to interest is inconsistent with its approving citation of *In re Landing Assocs., Ltd.*, 122 B.R. 288, 297 (Bankr.W.D.Tex. 1990). The *Landing* court specifically found that post-petition rentals increased the extent of the secured claim such that the undersecured portion was reduced to zero. Only then, after elimination of the deficiency claim, did the court allow post-petition interest. *Id.*

was filed, it was a non-recourse creditor without the right to assert a claim beyond the value of its collateral. By operation of § 1111(b), however, Hancock became entitled to an additional unsecured claim to the extent its allowed claim exceeded the value of its collateral. The Debtor then must devote assets to satisfy the unsecured claim of Hancock, assets that could be used to pay a higher value to other unsecured creditors. Therefore, the unsecured creditors would get less than full present value when Hancock would be getting interest even though it claims to be undersecured. That is precisely what § 506(b) and *Timbers* do not permit— only oversecured creditors get interest.

## IV. ALLOWANCE OF POST–PETITION INTEREST UNDER § 506(b)

Hancock's argument that it is equitable to apply post-petition rents to interest would have more appeal if Hancock did not have an unsecured claim, as would be the case if the building were being sold. *See* § 1111(b)(1)(A)(ii). But if Hancock did not in fact have an unsecured claim, its resort to equity would be unnecessary because under this Court's view of valuation timing, an equity cushion would be created by post-petition rents from which § 506(b) interest would be allowed. *See also Landing*, 122 B.R. at 297. That is, whether there is no deficiency at the commencement of the case or whether the deficiency is reduced during the pendency of the case, § 506(b) applies once the creditor is oversecured as a result of accumulated rents. *See Timbers*, 484 U.S. at 374, 108 S.Ct. at 632 (interest payments may come from equity cushion created by post-petition rents under § 552); *see also Rake v. Wade*, — U.S. —, —, 113 S.Ct. 2187, 2189, 124 L.Ed.2d 424 (1993) (oversecured creditor is entitled to postpetition interest to the extent oversecured, citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103

L.Ed.2d 290 (1989)); *In re Fesco Plastics Corp.*, 996 F.2d 152, 156 (7th Cir.1993) (post-petition interest allowed to creditor to the extent security is worth more than principal and interest due).

█ Specifically, to the extent that such interest is allowed under § 506(b), it "accrues as part of the allowed claim from the petition date until the confirmation or effective date of the plan." *Rake*, — U.S. at —, 113 S.Ct. at 2191.[5] Hancock's interest has been accruing since May, 1991, on a principal claim of approximately $11,160,000 and, therefore, will be allowed to the extent that post-petition net rents as of the effective date of confirmation (plus the $10,000,000 building) exceed the amount of its petition-date allowed claim. This leads, of course, to the matter of the Debtor already having paid over $1,160,000 to Hancock during the pendency of the case. In *Bloomingdale I* where Hancock's total collateral had not yet exceeded its total allowed claim, this Court treated the payments as voluntary prepayments of what would have been Hancock's secured claim measured as of confirmation. With the passage of more time and accrual of additional rents, Hancock has become entitled to post-petition interest under § 506(b). Therefore, the conclusion in *Bloomingdale I* stands with a minor refinement: post-petition payments made to Hancock shall be deemed prepayments of Hancock's allowed claim, *including § 506(b) interest*, measured as of the effective date of confirmation.

Allocating the post-petition payment as described above, however, does not resolve all of the issues regarding the post-petition net rents. Hancock also has requested that this Court enter an order compelling the Debtor to comply with the terms of the agreed cash collateral order that require continued payment of net rents over to Hancock. Any further payments ordered by this Court

---

**5.** The Debtor asserts that post-petition rents can only be used to pay Hancock's "claim," which by definition under § 101(5) and § 502(b)(2) excludes post-petition interest. This is an overly restrictive interpretation of Justice Scalia's comment in *Timbers*, quoted by this Court in *Bloomingdale I*, that § 552(b) rents may be applied to satisfy the "claim" of a secured creditor. *Timbers*, 484 U.S. at 374, 108 S.Ct. at 632. Subject

to being oversecured, § 506(b) provides that "there shall be allowed to the holder of such claim, interest on such claim." While technically not a § 101(5) "claim," the "allowed ... interest" is a substantive right that may be asserted against the estate in conjunction with, or "on," the allowed claim. *See Rake*, — U.S. at —, 113 S.Ct. at 2191 ("interest accrues as part of the allowed claim").

would be allocated in the same manner discussed above, in effect paying Hancock its allowed § 506(b) interest on an ongoing basis prior to the effective date of confirmation. *But cf. In re Oaks Partners, Ltd.*, 135 B.R. 440, 451 (Bankr.N.D.Ga.1991) (post-petition payments first extinguished deficiency but thereafter credited against cram-down payments instead of § 506(b) interest).

Paragraph 3 of the Agreed Cash Collateral Order provides that all post-petition rents, net of ordinary and necessary operating expenses, "shall be paid to John Hancock as and for the adequate protection of its security interest in the rents, income and profits flowing from the Property until further order of this Court." Hancock correctly notes that this Order has not been modified or terminated since being entered on July 23, 1991. Therefore, Hancock argues, any net rents that the Debtor has in its possession must be paid to Hancock pursuant to the terms of the Order. The Debtor responds that its obligations under the Order have been fully performed. "As Hancock's total allowed claim is presently totally secured by the value of the real property, its security interest in the rents is adequately protected." (Debtor's Resp. at 8.)

■ The Debtor concedes that rents exist that have not been paid to Hancock. Except for the Debtor's pending motion regarding the creation of a cash reserve to fund an environmental remedial project, however, the Debtor has no motion before this Court regarding the use of cash collateral. *See* § 363(c)(2); Fed.R.Bankr.P. 4001(b). Further, even if this Court accepted the Debtor's statement in its response brief as a request to use cash collateral, the Debtor ignores Hancock's allowance of interest under § 506(b). Interest has been accruing on Hancock's claim since the pendency of the case and will be allowed if and to the extent Hancock's collateral exceeds its claim. Hancock's collateral now exceeds its claim and, given the more than two years that have elapsed during this case, all the net rents that accrue are fully encumbered by Hancock's interest allowance. *Cf. Vermont*, 142 B.R. at 573 ("post-petition interest accruals may be collected from ... rent collateral by

virtue of 11 U.S.C. § 552(b)"). Therefore, the Debtor must continue to pay Hancock all net rents that are not the subject of the Debtor's pending motion to authorize an escrow account.

## V.  CHARGES AGAINST COLLATERAL UNDER § 506(c)

■ By agreement, the post-petition rents "shall be used only in the ordinary course of business of the Debtor, and only for: (a) ordinary and necessary costs and expenses related to the continued operation of the Property by the Debtor; [and] (b) any other costs or expenses authorized or to be authorized by order of this Court to be paid from the cash collateral after proper notice and a hearing." (Agreed Cash Collateral Order of July, 1991.) The Debtor now has filed a motion seeking to escrow $260,000 to finance such work as may be necessary to correct a noise problem allegedly caused by the Property's air conditioning system.

Hancock's interest in gross rents is subject to § 506(c) charges. Therefore, if the environmental remedial project is a valid § 506(c) charge, Hancock's collateral (and, therefore, interest allowance) would be reduced by that amount. The problem is the contingent nature of the expense since it has not been established whether any remedial action will in fact be required. Moreover, if the work is not done until after confirmation of a plan, cash collateral will not be available to pay the cost of the project. In effect, the Debtor would have to use after-debt service funds.

This Court has heard much testimony and received the written representations of the Debtor concerning the noise problem. It appears very likely that some substantial remedial work will be necessary, and the failure to do that work would substantially impair the value of the Property. The work, if done before confirmation, would be a proper § 506(c) charge against Hancock's collateral. In addition, § 552(b) contemplates that the Court may adjust the creditor's security "based on the equities of the case." Under the circumstances here, it is both equitable and reasonable for the Debtor to escrow funds to finance the remediation project.

Hancock's interest in the portion of its collateral used for the escrow can be protected by giving Hancock a reversionary interest. Any portion of the escrow unused as of the date of confirmation shall be remitted to Hancock. Thus, if it turns out that no proper § 506(c) charge is ever incurred, Hancock would have an additional claim for allowed interest presumably equal to the escrow balance, including interest earned on that balance. Of course, before a § 506(c) charge can finally be determined, it must be found that the expenses actually incurred are necessary and reasonable, as required by that section.

The Debtor will be allowed to escrow funds in accordance with this opinion.

## VI. DESIGNATION OF INSIDER CLAIMS

█ Hancock argues that two law firm-creditors are insiders whose votes on the plan should not be counted because of their continuing relationship with the Debtor and its general partners. The firms are not "insiders" as that term is defined in the bankruptcy code. *See* § 101(31). Nor do their relationships to the Debtor and its principals confer that status upon them. Many creditors in many cases have continuing relationships with the debtors that may influence their behavior in those cases. The code does not require that creditors respond only to one set of incentives and ignore all others, on penalty of having their votes discounted.

Moreover, Hancock raised this issue in connection with the first plan and the Court rejected it. The Court does so again. The law firm-creditors are not insiders and their votes will be counted.

## VII. CONCLUSION

The Debtor is directed to prepare an order in accordance with the foregoing discussion, disposing of the various motions dealt with in this opinion.